1      UNITED STATES DISTRICT COURT
       DISTRICT OF NEVADA
2  BEFORE THE HONORABLE LARRY R. HICKS, SENIOR DISTRICT JUDGE
        ---o0o---
3

4  James O'Doan,      : No. 3:17-cv-293-LRH-VPC
            :
5      Plaintiff,   :
            : November 16, 2017
6    -vs-      :
            :
7  City of Reno, Joshua  : United States District Court
  Sanford, Cade Leavitt,  : 400 S. Virginia Street
8           : Reno, Nevada  89501
      Defendants.  :
9  _____:

10

11       **TRANSCRIPT OF MOTION TO DISMISS**

12

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:   Luke Andrew Busby
            Attorney at Law
15

16

17  FOR THE DEFENDANT:   Mark Hughs
            Attorney at Law
18

19

20

21

22  Proceedings recorded by mechanical stenography produced by
  computer-aided transcript
23

24  Reported by:      KATHRYN M. FRENCH, RPR, CCR
            NEVADA LICENSE NO. 392
25            CALIFORNIA LICENSE NO. 8536

2

| | | |
|---|---|---|
| 01:12:13 | 1 | Reno, Nevada, Thursday, November 16, 2017, 1:30 p.m. |
| 01:12:29 | 2 | ---OoO--- |
| 01:13:05 | 3 | |
| 01:15:14 | 4 | THE COURT:  Good afternoon.  Have a seat please. |
| 01:32:53 | 5 | THE CLERK:  Today is the date and time set for |
| 01:32:56 | 6 | hearing on defendant's Motion to Dismiss, document number 10 |
| 01:32:59 | 7 | in civil case number 3:17-cv-293-LRH(VPC), James O'Doan versus |
| 01:33:05 | 8 | Joshua Sanford, et al. |
| 01:34:50 | 9 | Counsel, can you please state your appearances for |
| 01:34:52 | 10 | the record. |
| 01:34:52 | 11 | MR. BUSBY:  Good afternoon, Your Honor. |
| 01:34:54 | 12 | Appearing for plaintiff, James O'Doan, this is Luke Busby. |
| 01:34:58 | 13 | THE COURT:  Welcome to the courtroom. |
| 01:34:59 | 14 | MR. BUSBY:  Thank you, Your Honor. |
| 01:35:00 | 15 | MR. HUGHS:  Good afternoon, Your Honor.  Deputy |
| 01:35:01 | 16 | City Attorney Mark Hughs for the City of Reno and Officers |
| 01:35:05 | 17 | Sanford and Leavitt. |
| 01:35:06 | 18 | THE COURT:  Welcome to you as well.  I |
| 01:35:09 | 19 | appreciate having you both here.  I don't think I've had |
| 01:35:11 | 20 | the pleasure of having you appear before me before. |
| 01:35:18 | 21 | I'm familiar with the motion that's been filed, |
| 01:35:21 | 22 | the opposition and the reply.  I would tell you the one thing |
| 01:35:30 | 23 | I'm troubled by, that you might address in your arguments, but |
| 01:35:34 | 24 | I don't mean to limit your arguments either, the City, the |
| 01:35:42 | 25 | City's opposition focuses on a large amount of the police |

01:35:47  1   reports, the emergency calls that were made, the dialogue

01:35:51  2   back and forth between REMSA, the Police Department, and

01:35:58  3   the lady at the scene, whose name I don't recall, and other

01:36:08  4   reports.  And I'm troubled with a Motion to Dismiss under

01:36:12  5   12(b)(6) being dependent upon evidence that is not contained

01:36:21  6   within the plaintiff's Complaint, principally, because my

01:36:26  7   obligation is to determine whether if you accept as true

01:36:31  8   everything that's been alleged in plaintiff's Complaint and

01:36:35  9   is sufficiently specific to satisfy the various standards

01:36:41 10   that apply, much of that evidence is in opposition, or at

01:36:49 11   least inconsistent with what's been alleged in plaintiff's

01:36:52 12   Complaint.

01:36:52 13         I realize I can accept certain records, such as

01:36:58 14   public records that are routinely viewed as public records

01:37:04 15   that are not disputed in any way, but I don't think that that

01:37:07 16   extends to police reports.  Police reports are, classically,

01:37:11 17   hearsay.  They're not, classically, public records in the

01:37:16 18   sense of being matters of public record.  So for that

01:37:20 19   reason, I'm troubled over the issues in the motion.  I

01:37:26 20   understand -- I anticipate what each side is going to argue

01:37:31 21   as a result of the pleadings that have been filed but,

01:37:34 22   essentially, what's being presented to the Court is a Motion

01:37:41 23   For Summary Judgment before there's been any discovery in the

01:37:45 24   case, and without any -- I shouldn't say without any, but not

01:37:54 25   based upon the actual evidence in the case.

| | | |
|---|---|---|
| 01:37:58 | 1 | So, that's troubling me with this particular |
| 01:38:01 | 2 | motion.  On the other side of the coin, I would say this, that |
| 01:38:07 | 3 | virtually everything that I've seen filed would be admissible |
| 01:38:10 | 4 | for purposes of trial, for purposes of summary judgment. |
| 01:38:16 | 5 | Maybe I shouldn't make it that much of a blanket admissibility |
| 01:38:20 | 6 | without hearing any opposition that might be made, but I can |
| 01:38:26 | 7 | tell you that in my experience most of that evidence that I |
| 01:38:30 | 8 | see is, classically, presented with motions for summary |
| 01:38:34 | 9 | judgment.  And then if the motion is not successful in some |
| 01:38:38 | 10 | respect, that's the evidence that tends to be presented at |
| 01:38:44 | 11 | trial, which tends to be in dispute, and it's up to, of |
| 01:38:48 | 12 | course, the Court or the jury to decide the disputed evidence. |
| 01:38:52 | 13 | But, that's what's troubling me at this point in |
| 01:38:55 | 14 | time.  I feel like I'm being handed the whole case here on the |
| 01:39:00 | 15 | merits.  I think both sides -- I don't see anything to suggest |
| 01:39:04 | 16 | that anyone is not citing what is actually in the record, |
| 01:39:08 | 17 | and I sense that there's probably not as much of a dispute |
| 01:39:12 | 18 | concerning specifics, state of mind and so forth, and the |
| 01:39:17 | 19 | degree of Mr. O'Doan's disability, are clear questions of |
| 01:39:26 | 20 | fact that can't be resolved simply by looking at the pleadings |
| 01:39:30 | 21 | and the states of mind of the officers too.  You can make |
| 01:39:37 | 22 | inferences from what you read and see, but you actually need |
| 01:39:42 | 23 | see and hear witnesses or have qualified evidence presented |
| 01:39:44 | 24 | to you, I don't consider the police reports are the kind of |
| 01:39:49 | 25 | public records that -- unless both sides agree that they could |

5

01:39:53  1  be considered by the Court -- are properly considered in a

01:40:00  2  12(b) Motion to Dismiss.

01:40:02  3          So, that's what I'm troubled about.  I just thought

01:40:05  4  I'd give you a heads up on it.  It's clear to me that there's

01:40:09  5  a lot that's involved from both sides in this case.  And it's

01:40:15  6  interesting and I welcome you to argue the motion.  I'm happy

01:40:20  7  to hear what you have to say.

01:40:22  8          So, Mr. Busby, do you want to go ahead?

01:40:25  9          MR. HUGHS:  Your Honor, it was the City's

01:40:26 10  motion.

01:40:27 11          THE COURT:  Oh, I'm sorry.  I got so busy

01:40:32 12  focusing on the evidence I confused who is the moving party.

01:40:35 13          But it's you, Mr. Hughs and you're up.  You're

01:40:38 14  welcome to go forward.

01:40:40 15          MR. HUGHS:  Thank you, Your Honor.

01:40:47 16          Your Honor, I fear that I'm going to tread a little

01:40:52 17  bit where the Court expressed its concerns, although I suspect

01:40:59 18  that the parties would agree that the exhibits to the motion,

01:41:03 19  to the City's motion can be discussed today because, in

01:41:06 20  fact, before the hearing started, I saw Mr. Busby preparing

01:41:10 21  to present some of them to the Court in this matter.

01:41:15 22          I'd also point out for Your Honor, and the Court is

01:41:18 23  obviously aware, you know the law that the Court may consider

01:41:22 24  publically -- public -- judicially noticeable documents in a

01:41:29 25  Motion to Dismiss.  But I think what's also important here is

01:41:32   1   a portion of the basis for the Motion to Dismiss is qualified

01:41:36   2   immunity.  And there's a longstanding precedent that qualified

01:41:41   3   immunity is a matter that should be taken up early in a case,

01:41:45   4   before too many proceedings have occurred.  And that's another

01:41:49   5   reason why I think it's important to have the Court consider

01:41:52   6   those documents.

01:41:54   7        Police reports are routinely requested, and so

01:41:57   8   police reports, I think, are rightfully considered a public

01:42:03   9   document.  And I believe both parties are going to probably

01:42:07  10   address them.  I can't guess as to --

01:42:09  11        THE COURT:  Well, let me suggest that both

01:42:11  12   parties are free to refer to those public, what are perceived

01:42:18  13   to be public documents, reserving objection on behalf of

01:42:23  14   either side who would be objecting to that at some later time.

01:42:27  15   I want to hear your arguments.  It helps for me to become

01:42:31  16   completely familiar with the case as well.  And so you're

01:42:36  17   free to refer to those, even though I've expressed whether

01:42:40  18   I consider -- whether I can consider them for purposes of

01:42:43  19   your motion, Mr. Hughs.

01:42:45  20        MR. HUGHS:  Thank you, Your Honor.  And I

01:42:46  21   suspect I won't be referring to them a great deal, other

01:42:50  22   than generally in regard to the motion.

01:42:52  23        Your Honor, this is a 12(b)(6) motion, a motion,

01:42:55  24   basically, arguing that the plaintiffs have failed to state

01:42:58  25   a claim upon which they can seek relief.  The City's basic

| | | |
|---|---|---|
| 01:43:05 | 1 | concern is that the entire motion is the "after the fact" type |
| 01:43:09 | 2 | of reasoning prohibited by <u>Graham versus Conner</u>.  In other |
| 01:43:13 | 3 | words, the Complaint is based upon a review of circumstances |
| 01:43:18 | 4 | not as they existed at the time and as the officers |
| 01:43:21 | 5 | encountered them -- which is why we felt it was important |
| 01:43:24 | 6 | for the Court to see some of the public records concerning |
| 01:43:27 | 7 | what the officers knew at the time -- but that, instead, the |
| 01:43:31 | 8 | plaintiffs are presuming knowledge that goes beyond what the |
| 01:43:34 | 9 | officers knew at the time.  And in fact, I anticipate that |
| 01:43:41 | 10 | plaintiffs are even going to go so far, today, Your Honor, |
| 01:43:44 | 11 | as to try to present evidence which isn't even part of the |
| 01:43:47 | 12 | briefing or the motions at all, but that has occurred because |
| 01:43:50 | 13 | discovery is ongoing at this point in time.  And that I would |
| 01:43:53 | 14 | object to.  Anything which isn't a judicially noticeable |
| 01:43:58 | 15 | public document, I would object to the Court's consideration. |
| 01:44:00 | 16 | Your Honor, the plaintiff's basic argument, or |
| 01:44:05 | 17 | basic premise of their case here -- and there's only one |
| 01:44:09 | 18 | claim against the City, by the way, just an ADA or Americans |
| 01:44:13 | 19 | with disabilities claim.  All the other claims are civil |
| 01:44:16 | 20 | rights claims and/or state tort claims against one or more |
| 01:44:19 | 21 | of the officers.  The basic premise is the City must have |
| 01:44:23 | 22 | violated the Americans with Disabilities Act because its |
| 01:44:28 | 23 | officers arrested a man with epilepsy, and that the officers |
| 01:44:32 | 24 | must have violated civil rights because they arrested a man |
| 01:44:35 | 25 | with epilepsy.  But, Your Honor, as you're familiar with the |

01:44:40  1   briefs, the ADA does not prohibit arrests of someone with

01:44:44  2   epilepsy, where it's objectively reasonable under the totality

01:44:48  3   of circumstances to do so.

01:44:50  4           I'd also point out, and this is most certainly a

01:44:53  5   public record, the justice court record that is included in

01:44:56  6   the Motion to Dismiss, that probable cause for the arrest

01:44:59  7   was found by the justice court, and so that raises the specter

01:45:05  8   of issue preclusion.  In other words, the plaintiffs can't

01:45:08  9   relitigate that issue.  It's already been found by a court to

01:45:11  10  exist.  And that's under <u>Five Star Capital Corporation versus</u>

01:45:18  11  <u>Ruby</u>, which is 124 Nevada 1048; 194 P.3d 709.

01:45:27  12          MR. BUSBY:  Your Honor, just for the record, I

01:45:29  13  would like to lodge an objection.  That argument being beyond

01:45:33  14  the scope of what was argued in the briefs.

01:45:35  15          THE COURT:  All right.  I'll note the objection.

01:45:36  16          Go ahead, Mr. Hughs.

01:45:38  17          MR. HUGHS:  Okay.  And Your Honor, I think it's

01:45:39  18  appropriate for this hearing to be able to argue the law

01:45:42  19  beyond the briefs, otherwise we wouldn't need to be here.

01:45:45  20          But for that reason, where probable cause was found,

01:45:48  21  that cannot be relitigated, and so certain claims are knocked

01:45:54  22  out by the fact that where probable cause exists, you cannot

01:45:57  23  have a 1983 unlawful seizure claim; you cannot have a state

01:46:02  24  law false arrest claim; you cannot have a state court false

01:46:06  25  imprisonment claim because the Court, the justice court in the

01:46:10   1    State of Nevada found probable cause exists.  So as to those

01:46:15   2    claims, right there, they're knocked out by the fact that

01:46:18   3    probable cause was found and we don't get to relitigate.  We

01:46:21   4    don't allow one court the second -- to retry what another

01:46:26   5    court did.

01:46:26   6            So the real issue here, then, Your Honor, is

01:46:31   7    the allegations have to raise more than a possibility that

01:46:33   8    the defendants acted unlawfully.  And with the arguments

01:46:38   9    we provided, and the information and judicially noticeable

01:46:43   10   documents with the motion, we believe the motion demonstrates

01:46:46   11   that police were called because medical providers had

01:46:51   12   encountered a violent and uncooperative man.  He appeared

01:46:55   13   to be breaking the law.  He reacted to the police in a -- with

01:46:59   14   a threatening gesture when they approached him.  And, he posed

01:47:03   15   a danger to himself and those around him.  Under the totality

01:47:07   16   of circumstances, it was reasonable for the police to arrest

01:47:11   17   Mr. O'Doan.

01:47:12   18           And that basically boils down what's going on here,

01:47:15   19   Your Honor.  Under those circumstances, it doesn't matter

01:47:19   20   whether Mr. O'Doan is an epileptic or not.  What the police

01:47:23   21   knew at the time -- and the motion has a timeline in it.  It

01:47:28   22   indicates, for instance -- call histories were provided, but

01:47:33   23   it wasn't until 6:55 that police officers were called.  So at

01:47:37   24   that point in time, REMSA had already responded, the Reno Fire

01:47:43   25   Department had already responded.  They were both staging,

01:47:46  1    waiting for law enforcement, because -- and the record

01:47:49  2    reflects this -- in fact, the call log, which is Exhibit 5

01:47:53  3    to the motion, records not word for word what's in the

01:47:57  4    recordings, but some of what was reported, that Mr. O'Doan

01:48:03  5    was violent, uncooperative, hurting himself, had torn up his

01:48:09  6    house, and was trying to break out of his house.  That's a

01:48:13  7    person where law enforcement needs to step in because medical

01:48:17  8    responders aren't going to provide him with medical relief

01:48:20  9    until he's under control.

01:48:21  10           And once he did break out of his house, and the

01:48:24  11   police encountered him after he was walking down the street

01:48:28  12   naked on Kietzke Lane, on a summer night, with, by the way a

01:48:33  13   contingent of fire and REMSA, you know, basically following

01:48:38  14   along Kietzke Lane trying to stay with Mr. O'Doan, there was

01:48:44  15   a danger to himself, to all those responders, and to anybody

01:48:47  16   else on Kietzke Lane, you know, especially if Mr. O'Doan had

01:48:51  17   decided to just walk out into the street, or encountered a

01:48:55  18   bunch of children, we don't know what would have happened.

01:48:57  19           What we do know is when the police encounter him, he

01:49:00  20   turned around, made a threatening gesture.  In other words, he

01:49:04  21   responded to the police.  He did not appear to be in the fits

01:49:07  22   of some epileptic bout at that time.  So, their actions were

01:49:13  23   appropriate and reasonable under the circumstances known to

01:49:17  24   the police.  That's all they knew when they arrested him and

01:49:19  25   when they detained him.  There was no -- and the records will

01:49:27  1  indicate that there's no further indication that the officers

01:49:30  2  knew anything more, or that they found out anything more,

01:49:34  3  Your Honor, that would change the reason for the arrest or

01:49:37  4  the reason for charging Mr. O'Doan.  And then, again, we run

01:49:41  5  into the fact that once Mr. O'Doan went to court, probable

01:49:45  6  cause was found for his arrest.  So, that erases any question

01:49:49  7  about those issues right there.

01:49:54  8          So what we've got is an ADA violation, Your Honor,

01:49:57  9  against the City, based upon Mr. O'Doan's arrest.  The entire

01:50:02  10  premise of the Complaint with that allegation is if he was

01:50:06  11  arrested, there must be an ADA violation there.  But, that's

01:50:10  12  not the case.  You can arrest a person with epilepsy.  And

01:50:14  13  under the circumstances, it was appropriate to do so.

01:50:16  14          The excessive force claim against Officer Sanford,

01:50:20  15  again, under the totality of circumstances, it was reasonable

01:50:23  16  for him to use hands on -- and that's all he used was hands

01:50:27  17  on force to detain Mr. Sanford.  -- excuse me -- Mr. O'Doan.

01:50:32  18  The fact that Mr. O'Doan fought back, resisted, and injured

01:50:36  19  himself in the process, is really beyond the police control,

01:50:40  20  but that's, yet, another reason why it was appropriate for

01:50:44  21  them to take him down.

01:50:45  22          The unlawful seizure, again, probable cause finding

01:50:48  23  deletes that claim.

01:50:49  24          The due process claim is basically premised on an

01:50:55  25  allegation that Sanford and Leavitt did not put in their

—12—

| | |
|---|---|
| 01:51:00 | 1 |
| 01:51:02 | 2 |
| 01:51:06 | 3 |
| 01:51:09 | 4 |
| 01:51:14 | 5 |
| 01:51:17 | 6 |
| 01:51:20 | 7 |

01:51:00  1   probable cause statement the fact that Mr. O'Doan was an

01:51:02  2   epileptic.  But, there was never any confirmation of that.

01:51:06  3   And there's nothing in the Complaint or in any public record

01:51:09  4   that will indicate there was a confirmation of epilepsy.  And

01:51:14  5   again, he then went to Court where probable cause was found

01:51:17  6   for the arrest.  If that was the case, I think there would be

01:51:20  7   a concern there.

01:51:21  8        I would also note, though, Your Honor, they

01:51:24  9   didn't put that he was violent or breaking out of his house

01:51:27  10  or uncooperative -- I think "uncooperative," the word was in

01:51:33  11  there, but they didn't use every word that was told to them

01:51:36  12  on the call in their probable cause statement, and that does

01:51:39  13  not create a due process claim.

01:51:41  14        With regard to the assault and battery, which is

01:51:44  15  just a State tort claim, Your Honor, again, it was reasonable

01:51:47  16  for the officers to do what they did.  And I think even

01:51:50  17  the plaintiffs had conceded in their opposition that the law,

01:51:55  18  essentially, is the same for the State tort claim, as it

01:51:58  19  would be for on excessive force claim, Your Honor.  If it

01:52:01  20  was reasonable under the circumstances to use the force they

01:52:04  21  did and detain Mr. O'Doan, then it was proper to take him

01:52:09  22  down in the manner they did.  And I think it's important

01:52:11  23  to note that the police had, obviously, other tools, other

01:52:16  24  weapons available to them, but they just went hands on with

01:52:20  25  Mr. O'Doan.  They tried to use a taser, it didn't work, but

-13-

| | |
|---|---|
| 01:52:24 | 1 |
| 01:52:27 | 2 |
| 01:52:31 | 3 |

```
01:52:24   1  they just went hands on with Mr. O'Doan.  They didn't do
01:52:27   2  anything more severe.  They didn't beat him with a baton.
01:52:31   3  They didn't use any other weapons of that nature.
01:52:34   4       So, Your Honor, the bottom line is when you look
01:52:36   5  at the Complaint with the information which the Court can
01:52:40   6  review, especially when qualified immunity is at issue, as
01:52:44   7  it is with these civil rights claims, the plaintiff doesn't
01:52:47   8  state a plausible claim for relief.  There is -- he cannot
01:52:51   9  support   a cognizable theory of liability here.  A claim
01:52:55  10  is not plausible, Your Honor, where there is a reasonable,
01:52:59  11  alternative explanation for what happened.
01:53:03  12            THE COURT:  All right.
01:53:03  13            MR. HUGHS:  Thank you, Your Honor.
01:53:04  14            THE COURT:  Thank you, Mr. Hughs.
01:53:05  15       Mr. Busby.
01:53:06  16            MR. BUSBY:  Thank you, Your Honor.
01:53:16  17       If it please the Court, I have a few PowerPoint
01:53:19  18  slides that I would like to use to help guide you through my
01:53:23  19  presentation.  And, it's, actually, mostly for me, to help me
01:53:26  20  guide me through my presentation.
01:53:28  21       Your Honor, this case, the factual genesis of this
01:53:31  22  case is Mr. O'Doan's girlfriend, April O'Fria calling 911,
01:53:37  23  responding to Mr. O'Doan, clearly, having a very severe
01:53:41  24  seizure.  He's an epileptic.  He's known to be an epileptic.
01:53:46  25  He's subject to these horrific seizures from time to time.
```

01:53:50   1   And listening to Exhibit 1 to the motion, Exhibit 3 to the

01:53:53   2   motion, Exhibit 4 to the motion, and exhibit 6 to the motion,

01:53:57   3   this fact is made perfectly clear.

01:53:58   4           Mr. O'Doan had a seizure in the shower.  That's

01:54:02   5   why he was naked.  After he has a seizure, he goes into a

01:54:06   6   postictal state.  He's, basically, not conscious.  His

01:54:10   7   girlfriend, aware of what happens after he has a seizure,

01:54:13   8   calls 911, is terrified that the police are going to attack

01:54:17   9   them, informed them over and over again, please let them

01:54:21   10  know he's an epileptic.  He's having a seizure.  He needs

01:54:24   11  medical attention.  Last time, the cops beat him up because

01:54:28   12  they didn't listen to them.

01:54:30   13          Now, that raises the question did the police know

01:54:33   14  before encountering Mr. O'Doan what the situation was?  And

01:54:36   15  the answer to that question is yes.  The logs from the 911

01:54:39   16  call in Exhibit 5 to the motion, clearly show that that's

01:54:43   17  the case.  And it's alleged in the Complaint, that the Court

01:54:47   18  accepts that fact at true.  It's -- it's a fundamental bedrock

01:54:54   19  fact for Mr. O'Doan's case.

01:54:56   20          Other central operative facts in the case that are

01:54:59   21  important, Sanford and Leavitt were advised that O'Doan was an

01:55:07   22  epileptic.  Sanford's own report describes the extent of the

01:55:12   23  use of force on Mr. O'Doan.  He describes, essentially, Judo

01:55:16   24  throwing Mr. O'Doan and he states that --

01:55:17   25          MR. HUGHS:  Your Honor, I will object.  There is

01:55:19   1    no -- well, I won't.  I'll strike that.  Excuse me.

01:55:25   2              MR. BUSBY:   And that Mr. O'Doan, the Judo throw

01:55:27   3    caused him to suffer injuries to his head.

01:55:30   4              O'Doan was transported via ambulance to Renown.  The

01:55:33   5    ER doctor at Renown diagnosed him with having had a seizure.

01:55:38   6    He informed Sanford and Leavitt about this fact.  And after

01:55:42   7    even knowing what occurred, the officers decided to arrest

01:55:46   8    him anyway.  They never did mention the true facts and

01:55:50   9    circumstances in any of their reports.

01:55:53  10              So in the City's arguments, which the Court is

01:55:57  11    familiar with, basically create straw man arguments, arguments

01:56:04  12    that we don't even make, and they attack them because they're

01:56:07  13    easier to attack than the arguments we do actually make.  For

01:56:11  14    example, the City argues that the officers should ignore the

01:56:14  15    dangers and actual circumstances they encounter.

01:56:17  16              Okay.  Well, what are the actual circumstances?

01:56:18  17              They were told this is an epileptic who is having a

01:56:21  18    seizure, before they even got there.  So, they knew that.

01:56:25  19              O'Doan was diagnosed with having a seizure by

01:56:27  20    Dr. Di Rocco at Renown.  The whole point of the 911 call was,

01:56:34  21    hey, this person is having a seizure.  If you listen to the

01:56:34  22    calls back and forth between REMSA, the Fire Department, and

01:56:36  23    the police, that's what the discussion is about:  This guy is

01:56:39  24    postictal.  He's violent.  Right?  He's uncooperative.  He's

01:56:44  25    not in his right mind.

01:56:47   1            First responder medical personnel know what that

01:56:49   2   means.  If the police didn't know what that means, then that

01:56:52   3   supports our ADA claim.  At a minimum, they knew he was

01:56:55   4   epileptic.  And I think it's common knowledge that everybody

01:56:58   5   knows that epileptics have seizures.

01:57:02   6            Sanford was provided with O'Doan's discharge papers

01:57:05   7   from Renown, which very clearly state, you know, he's got

01:57:08   8   abrasions, he's got injuries, and he had a seizure.  But, they

01:57:11   9   arrested him anyway.

01:57:12  10            Now --

01:57:13  11            MR. HUGHS:  Your Honor, I will object.  I don't

01:57:15  12   believe that the Complaint alleges he was provided with

01:57:17  13   discharge papers.

01:57:20  14            MR. BUSBY:  Your Honor, if I may.  Just one

01:57:22  15   moment.

01:57:24  16            THE COURT:  All right.

01:57:52  17            MR. BUSBY:  Well, Your Honor, O'Doan got

01:57:54  18   from Renown, via the Reno Police, and the police were provided

01:57:58  19   with his discharge papers.  And that's been established in

01:58:02  20   discovery subsequent to the filing of the motion --

01:58:05  21            MR. HUGHS:  Which is basis for my objection,

01:58:07  22   Your Honor.

01:58:08  23            MR. BUSBY:  Okay.  Well, Title II of the ADA

01:58:11  24   requires public entities to take disability into account when

01:58:15  25   making -- when interacting with disabled persons, essentially.

01:58:19  1   The basis for our ADA claim is that Leavitt Sanford

01:58:23  2   discriminated against O'Doan by assaulting and battering

01:58:26  3   him, even though they knew he was an epileptic, and charging

01:58:31  4   him with a crime that is purely a result of him having this

01:58:34  5   disease.  It's not the result of a conscious action his part.

01:58:39  6          And, what's also become apparent is that the City

01:58:41  7   of Reno, in its capacity as policy-maker, completely failed to

01:58:44  8   train these first responders to recognize the symptoms of this

01:58:48  9   disability, of epilepsy.  Title II of the ADA requires them to

01:58:52  10  do that.  It requires them to make reasonable modifications to

01:58:55  11  their policies when they're dealing with a disabled person.

01:58:58  12  You don't -- the example that I used in the opposition of the

01:59:01  13  motion is you don't shoot a paraplegic for failing to raise

01:59:06  14  his hands in response to a police officer commanding him to

01:59:09  15  do so.

01:59:09  16          It's not logically possible for O'Doan to respond to

01:59:13  17  the commands of the police when he's in a postictal state.

01:59:16  18  He's not in control.  And the evidence in this case is going

01:59:18  19  to prove that unequivocally.

01:59:21  20          Now, the City argues that we haven't made a

01:59:24  21  cognizable claim.  Well, the case law clearly shows that

01:59:28  22  that's not the case.  The Ninth Circuit in Sheehan (phonetic)

01:59:32  23  versus San Francisco, as an issue of first impression,

01:59:35  24  unequivocally said that Title II applies to arrests; meaning,

01:59:40  25  that you have to take disability into account when you

01:59:43  1    arrest someone, and you have to take disability into account

01:59:46  2    subsequent to the arrest.

01:59:48  3            Okay.  So, did we allege that disability wasn't

01:59:52  4    taken into account?

01:59:53  5            Yes.  If the premise of the Complaint that O'Doan

01:59:57  6    was arrested because he has epilepsy, then that would be a

02:00:00  7    de facto violation of Title II.  That's the most clear example

02:00:05  8    of failing to take disability into account that I can think

02:00:08  9    of.

02:00:09  10           The Ninth Circuit, in the Sheehan decision,

02:00:13  11   specifically recognized two types of Title II ADA claims.

02:00:18  12   One for wrongful arrest, which occurred here, where police

02:00:23  13   arrest someone with a disability because they misperceive the

02:00:26  14   affects of that disability as criminal activity.  Okay?

02:00:30  15           And that's -- the fact that Di Rocco, at Renown,

02:00:33  16   told them this guy had had a seizure, is, if proven true,

02:00:37  17   is, essentially, conclusive evidence of this claim; that

02:00:41  18   Mr. O'Doan was wrongfully arrested in violation of Title II

02:00:44  19   of the ADA.  It also requires reasonable accommodations, where

02:00:50  20   although police properly investigate and arrest a person with

02:00:52  21   a disability, for a crime unrelated to that disability, they

02:00:55  22   fail to reasonably accommodate the person's disability in the

02:01:00  23   course of the investigation and arrest.  Okay?

02:01:03  24           We're not arguing that the police shouldn't have

02:01:05  25   detained Mr. O'Doan.  But according to the guidelines from

—19—

02:01:08   1   the Epilepsy Foundation, Police Best Practices, you don't use

02:01:12   2   deadly force on a sick person --

02:01:20   3              THE COURT:  Well, let's be realistic here.

02:01:22   4   There's no deadly force that's obvious from anything that

02:01:25   5   you've filed in this case.  I mean it, obviously, was a

02:01:28   6   hands on takeover by the police.  I give you credit if you

02:01:36   7   resolve all charges in your Complaint in your favor, that

02:01:43   8   you could make a case for excessive force, if the evidence

02:01:48   9   developed that, but there's nothing in your Complaint that

02:01:52  10   shows excessive force was used by these officers.

02:01:55  11              MR. BUSBY:  Your Honor, we respectfully, of

02:01:59  12   course, disagree with that.  If you look at --

02:02:00  13              THE COURT:  Okay.  Well, tell me why you

02:02:02  14   disagree with it.

02:02:02  15              MR. BUSBY:  Oh, of course.  Officer Sanford's

02:02:05  16   own description of what he did to O'Doan, contained in his

02:02:08  17   report, which is attached as an exhibit to the motion, states

02:02:11  18   that he performed a reverse reap throw on O'Doan.

02:02:16  19              THE COURT:  Right.  And --

02:02:17  20              MR. BUSBY:  Now, the reverse reap throw --

02:02:19  21              THE COURT:  Well, wait.  Now what's the evidence

02:02:20  22   in your Complaint of what a reverse reap throw is, and why

02:02:24  23   that would be an improper approach to take charge of someone

02:02:29  24   who is not cooperating with the police?

02:02:32  25              MR. BUSBY:  Well, it's -- the allegation is that

02:02:35  1   O'Doan landed on his head after being thrown.  And if you trip

02:02:40  2   someone from behind using a Judo throw technique, the way

02:02:45  3   it's been described to me, they can land right on their head,

02:02:48  4   Your Honor.  And a person landing right on their head on the

02:02:51  5   concrete, when they're unaware, when they're incapacitated,

02:02:55  6   that can most certainly kill them.  That's the basis for our

02:02:58  7   allegation that this was deadly force, Your Honor.

02:03:01  8                 THE COURT:  Okay.  All right.

02:03:03  9                 MR. BUSBY:  Now, the Sheehan case has been to

02:03:07  10  the Supreme Court, and the Supreme Court ruled on one aspect

02:03:10  11  of the Sheehan case, the qualified immunity issue.  Sheehan

02:03:14  12  involved a mentally disabled woman who pulled a knife on

02:03:18  13  the police, unfortunately, and was shot.  And in that case,

02:03:22  14  the Supreme Court determined that qualified immunity applied

02:03:25  15  because it was, it was a fast moving situation.  There was an

02:03:29  16  actual, like, threat to the officer.  She had a knife.  But

02:03:33  17  the Ninth Circuit, on the ADA claim, specifically declined

02:03:38  18  to address whether the ADA applies to arrests.  And the

02:03:42  19  opinion states:  "We're not going to address this issue

02:03:45  20  because nobody really briefed it.  We granted certiorari

02:03:49  21  so the court could consider whether Title II of the ADA

02:03:52  22  applies to arrests.  And they changed the issues on us on

02:03:55  23  the briefing, so we decline to answer that question."

02:03:58  24           As such, the Ninth Circuit's opinion, underlying

02:04:02  25  opinion on the Title II issue in the Sheehan case that the

02:04:08  1    panel issued is good law in this jurisdiction.  Title II of

02:04:12  2    the ADA applies to arrests in the Ninth Circuit.

02:04:22  3              THE COURT:  I give you that, but how do you,

02:04:26  4    how do you compare the facts of this case with the facts in

02:04:29  5    Sheehan, where you actually have someone, a female, who is

02:04:34  6    shot by police officers, as I recall it was at least two or

02:04:39  7    three times, at a very close range, in her own home, in her

02:04:48  8    own dwelling place?  This case, seems to me, to be so far

02:04:54  9    removed Sheehan, that I have a hard time seeing how the facts

02:04:57  10   of Sheehan could be applied to this case.

02:04:59  11             MR. BUSBY:  And Your Honor, I think the

02:05:01  12   distinction is between the amount of aggression that was

02:05:05  13   clearly being shown by Sheehan towards the officers, and

02:05:10  14   the fact that she was armed.  That seemed to really sway

02:05:13  15   the Supreme Court's decision to grant qualified immunity.

02:05:17  16             THE COURT:  But, also, the fact that the

02:05:18  17   officers broke into her apartment, her dwelling place a

02:05:22  18   second time, as I recall -- I don't recall if the first time

02:05:26  19   was by force or not, but certainly the second time was, and

02:05:29  20   that when they did that, and she approached them with a knife,

02:05:32  21   they then shot her.  And my assessment of the case was that

02:05:37  22   the Supreme Court was very concerned that this happened in her

02:05:40  23   home, her living space, and that the officers chose, under

02:05:44  24   the circumstances, to break in, when their greatest concern at

02:05:48  25   that time would have been they just didn't know what was

—22—

02:05:52   1    happening inside.  And, that when they did break in, the woman

02:05:56   2    approached them, and they, then, not using hands on force,

02:06:02   3    not using a taser, draw their weapons and fire and shoot at

02:06:07   4    her and, in fact, shoot her at very close range.

02:06:12   5         So, I'm just having a real problem with -- the

02:06:18   6    facts of this case here is you have someone who is out in

02:06:21   7    the public.  They're not in their own living space.  You

02:06:24   8    have someone who is totally nude, walking down the street in

02:06:29   9    daylight hours.  He's walking down a street that heavily

02:06:33  10    trafficked, busy street, one of the main thoroughfares through

02:06:38  11    the streets of Reno.  And, he's not responding to police

02:06:44  12    requests.  And, he's also a great danger to himself, even

02:06:49  13    with all the medical personnel and everyone else on board

02:06:53  14    present at that scene.  The officers first attempt to taser,

02:06:58  15    which didn't work -- here I'm citing evidence that I said I

02:07:02  16    wouldn't rely on, but for sake of the argument, I will -- and

02:07:08  17    when that doesn't work, one the officers uses hands on force

02:07:13  18    to take Mr. O'Shea down -- or, O'Doan, excuse me.  And he is

02:07:19  19    arrested.  And, apparently, no one is disputing there was

02:07:24  20    some injury inflicted -- I don't know the extent of it, But

02:07:28  21    some injury inflicted at the time he was taken down.

02:07:31  22         So, I have a real problem with applying the Sheehan

02:07:35  23    case, although the principals of law are clear in Sheehan.

02:07:40  24         MR. BUSBY:  Understood, Your Honor.  And I think

02:07:42  25    the distinction is what specifically happens to an epileptic

02:07:46  1   when they're in postictal state that's different than a

02:07:50  2   normal, you know, schizophrenic person acting aggressively

02:07:55  3   towards the police.

02:07:55  4          And the way I understand it, based on the literature

02:07:58  5   I've read, and my discussions with our experts that we've

02:08:01  6   retained, is that basically a seizure completely shuts down a

02:08:04  7   person's brain.  They're convulsing.  They're sometimes, you

02:08:08  8   know, spitting, saying things.  And after the seizure, they go

02:08:12  9   into a postictal state where slowly, very slowly, full brain

02:08:18  10  function will return.  But in that interim period before it

02:08:21  11  returns completely, the person can be kind of in a dream-like

02:08:26  12  state.  And the proper procedure for dealing with a person

02:08:30  13  who is in that state is to, number one, you can't yell at

02:08:34  14  them because they become more frightened.  And if you use

02:08:38  15  physical force against a postictal epileptic, they will,

02:08:42  16  quite commonly, become combative because they don't know

02:08:45  17  what's happening.  They're terrified.  Physical force is being

02:08:48  18  exerted on them, and so they respond involuntarily.

02:08:53  19         So, if an officer knows that, if an officer knows

02:08:58  20  how to deal with a postictal epileptic, approach them calmly,

02:09:03  21  don't yell at them -- basically, the Epilepsy Foundation

02:09:06  22  videos show people kind of trying to herd an epileptic, to

02:09:10  23  move them in a particular direction, rather than using force

02:09:14  24  against them.  If you know what to do in that circumstance,

02:09:17  25  then the outcome can be completely different.  You can avoid

02:09:22  1    injuring a person, perhaps, very gravely, who is suffering

02:09:26  2    from a medical condition only.

02:09:28  3          Now, Mr. O'Doan needed help that night.  His --

02:09:31  4    there's no denying that.  There's no denying that when he

02:09:35  5    was in a postictal state, you know, it's very strange for

02:09:39  6    people who encounter that.  But part of the claim we're

02:09:43  7    bringing in this case under the ADA is that, look, these,

02:09:46  8    these people misperceived what was going on.  Okay?  And

02:09:50  9    had they been trained properly, if they knew what to do,

02:09:53  10   there's no way Sanford would have used that kind of force on

02:09:57  11   Mr. O'Doan.

02:09:58  12         THE COURT:  What would he have done?

02:10:00  13         MR. BUSBY:  He could have spoken to him soft --

02:10:02  14   the record indicates that, basically, they were yelling at

02:10:05  15   him.  Stop.  Police.  And chasing after him.  Which, for a

02:10:09  16   person in a postictal state, is just going to terrify them.

02:10:13  17         THE COURT:  But, again, referring to the

02:10:15  18   evidence, weren't there a number of medical personnel present?

02:10:19  19   The REMSA people, who had gone on to standby because they

02:10:24  20   were unable to resolve the problem with Mr. O'Doan?

02:10:29  21         MR. BUSBY:  Well, there's a question about how

02:10:32  22   this all happened.  They didn't actually try to resolve it.

02:10:36  23   They never actually tried to control him.  My understanding is

02:10:40  24   he was walking down Gentry Way naked.  Ms. O'Fria was on the

02:10:45  25   phone following him, trying to tell the 911 operator where he

02:10:49  1   was.  The Fire Department was the first EMS responder on

02:10:54  2   scene.  The -- we've deposed four of the firefighters.  Their

02:11:00  3   stories about what happened are, you know, inconsistent to

02:11:03  4   some extent.

02:11:04  5          But, Mr. O'Doan is walking naked.  He looks like

02:11:07  6   he's -- they say he was power walking.  And they said, hey,

02:11:12  7   buddy, uh, you know, what's, what's going on?  And he just

02:11:15  8   looked at them and walked right past.

02:11:18  9          Now, for a postictal epileptic, for someone who

02:11:23  10  know about epilepsy, you can understand that that kind of

02:11:25  11  thing can happen.  But, apparently, the firefighters didn't

02:11:29  12  recognize it for what it was either, even though the 911

02:11:32  13  operator was told over and over again by Ms. O'Fria, look,

02:11:36  14  he's having a seizure.  He's having a seizure.  He needs

02:11:40  15  help.

02:11:40  16         So, you know, we're not questioning that the police

02:11:43  17  had a proper role to play in this process.  We're questioning,

02:11:48  18  you know, what Sanford did to O'Doan, whether that was

02:11:51  19  appropriate, given that he was suffering from a medical

02:11:54  20  condition.  And under --

02:11:56  21         THE COURT:  But let me come back to that

02:11:57  22  question because I kind of pulled you off of it was you were

02:12:01  23  responding.  What, what, in your view, should Officer Sanford

02:12:04  24  have done, short of taking some kind of physical control of

02:12:11  25  Mr. O'Doan?

—26—

02:12:13  1          MR. BUSBY:  First, he should have approached him

02:12:15  2    without yelling at him.  That's number one.  Because if you

02:12:18  3    yell at a postictal epileptic, you're going to terrify them.

02:12:23  4          Number two, if you can, you can herd them by

02:12:27  5    stepping in front of them, kind of directing them where to go.

02:12:30  6    And Mr. O'Doan, you know, his girlfriend has seen him have

02:12:35  7    lots and lots of seizures, and when they're not -- when he

02:12:38  8    doesn't escape the house and they're not this horrific,

02:12:42  9    she's able to do that with him.  And that's what the Epilepsy

02:12:45  10   Foundation says should be done in these cases.

02:12:48  11         And if Sanford chose to take O'Doan down, he didn't

02:12:51  12   have to do it like that.  He didn't have to -- a reverse reap

02:12:59  13   throw, my understanding is if someone is facing away from you,

02:13:03  14   you grab them from behind.  You stick your food in front of

02:13:07  15   their leg.  And you throw them to the ground.

02:13:10  16         Now, I have some experience with that kind of thing

02:13:15  17   from doing martial arts myself, and I've -- you know, if you

02:13:21  18   throw someone who is out of it, who is having a medical

02:13:25  19   condition like that on the ground, they can be severely

02:13:29  20   injured or killed.

02:13:30  21         And so, you know, there -- Officer Sanford had

02:13:35  22   options, had he taken into account what the actual situation

02:13:39  23   was.  This was an epileptic.  This wasn't a lunatic criminal

02:13:44  24   who -- you know, a fleeing felon.  Someone who had committed

02:13:47  25   some kind of horrific crime that was trying to get away from

—27—

02:13:51  1   the police.  This was a medical call.  Everybody knew that.

02:13:55  2          And so, O'Doan, you know, he's in a position where

02:13:59  3   he's terrified to call for help when he does have a seizure

02:14:04  4   because he's afraid, maybe the next time, maybe he will get

02:14:08  5   killed.

02:14:08  6          Now this case presents an opportunity for a

02:14:11  7   resolution of this issue, for the police to get properly

02:14:14  8   trained, and for the wrong that was done to him to be

02:14:17  9   recognized.  That's why the excessive force case -- claim

02:14:23  10  is so important in this case, Your Honor, and the ADA claim.

02:14:26  11         THE COURT:  Okay.  What was the extent of the

02:14:29  12  injury to Mr. O'Doan?

02:14:31  13         MR. BUSBY:  There is a litany of abrasions

02:14:35  14  and cuts that are listed on his ER report.  Now Sanford is

02:14:42  15  disputing that -- how those things were caused.  He says in

02:14:47  16  his reports that as a result of being thrown, Mr. O'Doan had

02:14:51  17  lacerations to his head and he was bleeding.

02:14:54  18         Apparently, after they got him, they pinned him

02:14:58  19  down face first on the ground, which is also, you know, a

02:15:02  20  big no, no for an epileptic.  You can kill them if do you

02:15:05  21  that.  And, he continued to struggle.  So, he had abrasions

02:15:09  22  all over his body.  And at the ER, they actually x-rayed his

02:15:15  23  feet because they thought his feet were broken.  He suffered

02:15:18  24  pretty serious injuries to his wrists as a result of being

02:15:22  25  handcuffed because, if you try and do that to a postictal

—28—

02:15:26  1  epileptic, they're going to struggle.  They have no idea what

02:15:29  2  they're doing.

02:15:30  3         So, Your Honor, does that satisfy your questions on

02:15:36  4  that point?

02:15:37  5              THE COURT:  It gives me some insight.  Yes.

02:15:39  6              MR. BUSBY:  Okay.

02:15:41  7              THE COURT:  All right.  Go ahead.  I'm sorry.

02:15:42  8              MR. BUSBY:  That's okay.

02:15:43  9         So moving past Sheehan, Sanford's own report, you

02:15:51  10  know, describes the degree of force that was used in this

02:15:53  11  case.  And this is what Mr. O'Doan looked like, as presented

02:16:02  12  in Exhibit 2, after this encounter.  He's got very severe, you

02:16:06  13  know, cuts and scratches on his head.

02:16:11  14         The City argues that --

02:16:14  15              MR. HUGHS:  Excuse me.  My monitor isn't

02:16:16  16  working.  I don't know if it is up there.

02:16:17  17              THE COURT:  Yeah.  No, mine is not on either.

02:16:19  18              MR. BUSBY:  Your Honor, I'm just going have to

02:16:21  19  give up on this thing.  It's not working.  I've got it all

02:16:23  20  here.

02:16:23  21              THE COURT:  Well, I'm familiar with the exhibit.

02:16:25  22  I looked at that before I came into the courtroom.

02:16:27  23              MR. BUSBY:  Okay.

02:16:30  24         Now, the City argues that the use of force would

02:16:33  25  objectively reasonable.  And if you go through the Graham v.

29

02:16:37  1    <u>Conner</u> factors, well, you know, the evidence can most

02:16:40  2    certainly show otherwise.  And this case is actually a lot --

02:16:44  3    it's very similar to what happened in <u>Graham v. Conner</u>.

02:16:48  4    Dethrown Graham (phonetic), a diabetic, is having an insulin

02:16:51  5    reaction, runs into a grocery store, grabs some orange juice.

02:16:53  6    The police see him acting strange, like he's drunk.  They

02:16:57  7    detain him for a period of time and rough him up.   And,

02:17:02  8    eventually, they discover the truth of the situation.  He's

02:17:06  9    not drunk.  The orange juice, after they give it to him, takes

02:17:10  10   effect.  His blood sugar returns to normal.  And they let him

02:17:14  11   go.

02:17:14  12            Now, this case is even worse than that because they

02:17:17  13   didn't let Mr. O'Doan go after they figured out what was going

02:17:20  14   on.

02:17:20  15            O'Doan didn't make any verbal threats at the

02:17:23  16   officers.  He wasn't armed.  He made no attempt to physically

02:17:28  17   attack Sanford and Leavitt.  There's going to be disputed

02:17:31  18   testimony on whether he actually turned towards Leavitt and

02:17:35  19   made an aggressive action towards him.  A couple of the

02:17:38  20   firefighters testified that that didn't -- they didn't

02:17:41  21   indicate that that happened.

02:17:42  22            The nature of the call was clearly medical.  It

02:17:45  23   wasn't a domestic violence call.  Ms. O'Fria is begging for

02:17:49  24   help because her boyfriend had a seizure.

02:17:51  25            Alternative methods were available, as we

02:17:54  1   already discussed.  And no reasonable officer, knowing the

02:17:57  2   circumstances, knowing that this was a medical call, knowing

02:18:00  3   that this was an epileptic, would have done what Sanford did.

02:18:03  4   And we think we can produce evidence sufficient to show that

02:18:06  5   based on his own report, based on expert testimony on what

02:18:10  6   police should have done under these circumstances, so on and

02:18:14  7   so forth.

02:18:15  8        Now, the qualified immunity analysis, in the motion

02:18:19  9   it contains kind of a synopsis of the law, but it only seeks

02:18:23  10  qualified immunity analysis under one of the claims, which was

02:18:26  11  the excessive force claim.

02:18:29  12       Now, excessive force claims are factored in

02:18:34  13  inquiries.  They -- every one is going to be completely

02:18:37  14  different because every situation is completely different.

02:18:39  15  The Court has general principals to guide it, but there's no

02:18:42  16  question that the right to be free from excessive force is

02:18:45  17  well-established at the time of the arrest.  And because

02:18:49  18  Sanford knew O'Doan was epileptic, he could not have believed

02:18:56  19  his conduct was consistent with O'Doan's rights.  I don't

02:19:00  20  think there's anybody who thinks it's okay to Judo throw a

02:19:04  21  sick person.  But, that's the actual circumstance that Sanford

02:19:09  22  was facing.

02:19:10  23       The City argues that Sanford and Leavitt had

02:19:15  24  probable cause to arrest O'Doan.  Well, under the totality

02:19:19  25  of the circumstances known to Sanford and Leavitt, a prudent

02:19:22  1   person wouldn't have arrested him.  They arrested this guy

02:19:25  2   when he was in his hospital gown, at Renown, after an ER

02:19:29  3   doctor said he had a seizure, wearing a hospital bracelet.

02:19:33  4   They completely ignored what -- you know, this bizarre

02:19:38  5   situation.  Okay?  What's the cause of this?  They don't even

02:19:41  6   address any cause in the report, just the fact that he was

02:19:43  7   naked walking on the street.

02:19:45  8           They state in the motion that it was more

02:19:52  9   consistent with drug use.  Well, there's no evidence that

02:19:54  10   he was on drugs.  There is evidence that he had a seizure.

02:19:57  11   He's postictal.  That's why the whole call happened.

02:20:00  12           It's incredibly infuriating to a person with a

02:20:04  13   sickness like this, to explain facts and circumstances that --

02:20:08  14   where their behavior is odd, and to not be believed for no

02:20:13  15   reason, without good cause at all.  And, to be arrested for it

02:20:16  16   is much, much, much worse.  It's very harmful.

02:20:20  17           Now the central fact in this case is that he had

02:20:25  18   epilepsy and he had had a seizure.  And that's what all of

02:20:28  19   this -- all of the evidence is going to show here.  And

02:20:32  20   Sanford and Leavitt were deliberately indifferent and showed

02:20:36  21   a reckless disregard for this fact and for the truth.  And

02:20:40  22   there is a whole bunch of cases under the Devereaux v. Abbey

02:20:46  23   line of case in the Ninth Circuit, and the Hale v. Fish case

02:20:50  24   in the Fifth Circuit, which we cited, where you can show a

02:20:54  25   constitutional violation by showing an affidavit supporting

-32-

| | |
|---|---|
| 02:20:56 | 1 |

arrest wherein it contained critical omissions that would have

negated probable cause.

Well, the justice court judge who determined that
there was probable cause was not apprised of the facts in this
case.  Had he been apprised that, okay, the call was about
epilepsy.  The police were informed that this call was about
epilepsy before they encountered him.  They took him to the
hospital.  He was diagnosed with having had a seizure.  Okay?
If those facts were known to a judge trying to determine
probable cause in this case, the likelihood that probable
cause would have been found is minimal, in my humble opinion.

The City argues that Sanford and Leavitt's actions
were proper and justified and, therefore, we don't have an
assault and battery claim.  If what we prove about the
constitutional violation is true, then the use of force was
unlawful.  And, we do have such a claim against Sanford.  And,
the same basic analysis applies to the false arrest and false
imprisonment claims.  I mean, if there's no legal cause and
justification, if the arrest was in violation of Mr. O'Doan's
constitutional rights, and was without reasonable cause, then
those claims are valid.

And I would be glad to answer any questions you
have, Your Honor.

THE COURT:  All right.  No.  I don't have any
questions.  Thank you very much, Mr. Busby.

| | | |
|---|---|---|
| 02:22:15 | 1 | Mr. Hughs. |
| 02:22:16 | 2 | MR. HUGHS:  Thank you, Your Honor. |
| 02:22:19 | 3 | Your Honor, I'm very glad the Court asked what |
| 02:22:23 | 4 | should the police officers have done because we've been |
| 02:22:26 | 5 | asking that.  We asked it in discovery.  The response was |
| 02:22:28 | 6 | we don't have to tell you.  And that's really been a problem |
| 02:22:31 | 7 | for us in this case. |
| 02:22:32 | 8 | MR. BUSBY:  I object, Your Honor.  Discovery |
| 02:22:35 | 9 | is continuing.  We've provided documents from the Epilepsy |
| 02:22:38 | 10 | Foundation which show what should have been done.  We're |
| 02:22:41 | 11 | going to provide an expert who is going to explain what should |
| 02:22:44 | 12 | have been done. |
| 02:22:45 | 13 | THE COURT:  Okay. |
| 02:22:45 | 14 | MR. HUGHS:  With that being said, I think a lot |
| 02:22:47 | 15 | of Mr. Busby's argument strays from the 12(b)(6) inquiry, |
| 02:22:54 | 16 | which is all we're concerned with here today, and can be |
| 02:22:56 | 17 | concerned with. |
| 02:22:57 | 18 | Your Honor, the motion was -- and I, probably, in |
| 02:23:04 | 19 | hindsight, would do it a little differently, but the motion |
| 02:23:06 | 20 | was supposed to be a roadmap showing this is when the police |
| 02:23:10 | 21 | first heard the call and this is what they knew.  And that's |
| 02:23:13 | 22 | why on page 3 of the Motion to Dismiss, which is document 10, |
| 02:23:16 | 23 | at line 3, I indicate that it was at 6:55 that the police |
| 02:23:22 | 24 | officers were first called.  And that's important because the |
| 02:23:26 | 25 | audio was -- the audio tapes, the various ones I've provided |

02:23:32  1  to the Court, were to show the Court the context of what was

02:23:36  2  going on at the time the police were called.  But, what the

02:23:40  3  police heard only began at 6:55.  And then in the call log,

02:23:45  4  which is Exhibit 5 of the motion, you can see where -- or

02:23:52  5  18:55:35, that's where the police first receive their call

02:23:58  6  and, at that point, they were getting a call about someone who

02:24:01  7  was naked, epileptic, trying to break out windows and hurt

02:24:05  8  himself.  Someone who was uncooperative and violent.  That's

02:24:09  9  what the police knew, and that's why they acted appropriately

02:24:13  10  under the circumstances.

02:24:14  11        What, I think, is happened here, in the opposition

02:24:17  12  argument in this hearing, is there's been a lot of discussion

02:24:19  13  about things that aren't in the record, aren't in the

02:24:22  14  Complaint, aren't in any of the exhibits.  It's a lot of

02:24:26  15  what the plaintiffs want to put forth as a case.  But, we're

02:24:29  16  here to test the sufficiency of the Complaint.  And so that's

02:24:33  17  what the motion attempts to do, is say you can take these

02:24:37  18  judicially noticeable bits of information, you can look at

02:24:42  19  the Complaint, look at our argument and understand that,

02:24:46  20  under the circumstances, these claims aren't cognizable, that

02:24:52  21  under the test, under the Ashcroft test, under the test under

02:24:56  22  Rule 12(b)(6), they don't pass muster.

02:25:00  23        There's only a few things I want to address, just

02:25:06  24  quickly.  The paraplegic argument, I think is a false argument

02:25:11  25  here.  The problem is we have a naked man, who nobody knew

| | | |
|---|---|---|
| 02:25:15 | 1 | what was going on with him, the police officers didn't know |
| 02:25:18 | 2 | what was going on with him, going down a street, and they were |
| 02:25:20 | 3 | called to assist because he was violent and uncooperative. |
| 02:25:24 | 4 | When you argue this is the same as shooting a paraplegic, |
| 02:25:27 | 5 | no it's not, because it's pretty obvious when someone is a |
| 02:25:31 | 6 | paraplegic, if they are disabled or, for instance, in a |
| 02:25:35 | 7 | wheelchair or something like that. |
| 02:25:37 | 8 | There's no indication here.  The police had to go |
| 02:25:40 | 9 | with what they knew at the time.  And that's the Graham v. |
| 02:25:42 | 10 | Conner test.  What they knew at the time.  No Monday morning |
| 02:25:47 | 11 | quarterbacking. |
| 02:25:48 | 12 | With regard to the whole Sheehan discussion, the |
| 02:25:52 | 13 | only point the City is trying to make with regard to Title II |
| 02:25:55 | 14 | with regard to the American's with Disabilities Act, is |
| 02:26:02 | 15 | that, whether it applies or not, there is case law out |
| 02:26:05 | 16 | there, including in Sheehan, that says under the appropriate |
| 02:26:09 | 17 | circumstances, you can still arrest a person with a |
| 02:26:13 | 18 | disability.  In other words, a disability isn't a shield |
| 02:26:15 | 19 | from arrest under ADA.  That's what -- the point that the |
| 02:26:19 | 20 | City is trying to make. |
| 02:26:20 | 21 | As far as the finding probable cause in the justice |
| 02:26:30 | 22 | court, Your Honor, that does have issue preclusive effect. |
| 02:26:35 | 23 | That was a hearing before another court.  This court, this |
| 02:26:41 | 24 | district does not get to re-decide that issue.  That's issue |
| 02:26:44 | 25 | preclusion.  He was -- Mr. O'Doan had his chance in court at |

—36—

02:26:48  1   that time, and the Court could make as much of an inquiry as

02:26:53  2   it felt was appropriate, but there was a finding of probable

02:26:56  3   cause and, under those circumstances, certain claims just

02:26:59  4   can't exist.

02:26:59  5              MR. BUSBY:  Your Honor -- I'm sorry, Mr. Hughs.

02:27:02  6         Just for the record I would like to object, once

02:27:04  7   again, to that line of argument.

02:27:06  8              MR. HUGHS:  Okay.  Well, it's a legal argument.

02:27:08  9   It's a legal argument.  And so that's in the record, that the

02:27:13  10  Court found probable cause.  Five Star is the seminal case

02:27:18  11  in Nevada indicating what the issue preclusion test is.  The

02:27:22  12  issue preclusion -- the federal courts look to the State tests

02:27:27  13  for how issue preclusion is applied.  And so, in this case,

02:27:30  14  issue preclusion is applied because another court has already

02:27:36  15  decided this issue and it can't be decided again.

02:27:39  16        It would be akin to, for instance, Your Honor, a

02:27:42  17  coerced confession claim, when, in fact, somebody had already

02:27:47  18  been tried in state court and that court had already gone

02:27:50  19  through a whole hearing and a whole decision as to whether a

02:27:54  20  confession was coerced and decided it wasn't.  You can't then

02:27:57  21  have a federal court decide that issue again.  And there's a

02:28:01  22  whole line of authority regarding that.

02:28:05  23        So with that being said -- I'll just keep it

02:28:08  24  short -- we believe qualified immunity applies.  We believe

02:28:12  25  that under the facts and circumstances, the civil rights and

—37—

02:28:16  1   state tort claims can't be upheld, especially where there

02:28:20  2   was a finding of probable cause, and we don't believe the

02:28:23  3   allegations that, merely that Mr. O'Doan was arrested is

02:28:26  4   enough to support the ADA claim.

02:28:28  5           Thank you.

02:28:35  6           THE COURT:  All right.  Well, I'll give you a

02:28:39  7   decision on this soon.  As I said, I'm still very troubled

02:28:44  8   over -- and we're really arguing the merits of the case much

02:28:48  9   more than the 12(b)(6) issues that require the Court to

02:28:53  10  accept as true the well-pled allegations of the Complaint.

02:28:59  11  But, nonetheless, these issues are issues which are going

02:29:03  12  to be in front of this court, and so I appreciate, until a

02:29:07  13  resolution is finally made, either for defense or plaintiff,

02:29:12  14  so I appreciate the argument and the presentation.

02:29:16  15          I don't have any problem saying that Graham

02:29:22  16  certainly stands for the proposition that you have to go

02:29:26  17  by the reasonableness of the officer's conduct at the time

02:29:28  18  that that conduct occurs, rather than in hindsight.  And I'm

02:29:35  19  troubled over the fact that -- I mean, I can tell you I've

02:29:40  20  been dealing with drug cases for the last two or three weeks,

02:29:44  21  and these kind of symptoms; disorientation and people not

02:29:53  22  responding to commands of other people, of law enforcement

02:29:59  23  in particular, and sometimes the destruction of property,

02:30:02  24  threats, et cetera, these are all so, classically, symptoms of

02:30:06  25  drug use and abuse.  And I'm not suggesting, in any way, that

| | | |
|---|---|---|
| 02:30:10 | 1 | Mr. O'Doan was using some kind of drugs.  What I'm saying is |
| 02:30:15 | 2 | if you look at it from the police officer's standpoint, and |
| 02:30:18 | 3 | you have someone walking down a street in broad daylight, |
| 02:30:22 | 4 | nude, not responding to commands, appearing, at times, to be |
| 02:30:27 | 5 | hostile toward those people who may be trying to assist him |
| 02:30:31 | 6 | at the scene, if the officers -- and, very significant to the |
| 02:30:42 | 7 | Court, Mr. O'Doan is out in the public.  He's not in his home. |
| 02:30:46 | 8 | He's not locked in a bedroom.  He's not locked in a bathroom. |
| 02:30:50 | 9 | He's not in a confined quarters.  He's out in the public. |
| 02:30:54 | 10 | And, one, people are being exposed.  And certainly in broad |
| 02:31:01 | 11 | daylight, I certainly believe that there would have been |
| 02:31:07 | 12 | members of the public, which would have included children, |
| 02:31:10 | 13 | who could have been exposed somehow to Mr. O'Doan through no |
| 02:31:15 | 14 | fault of anyone.  But, the fact is that that's something that |
| 02:31:18 | 15 | the police have to be concerned about.  And, the fact that |
| 02:31:25 | 16 | this person could have just turned and walked out into the |
| 02:31:29 | 17 | traffic on the street, that he could have had some kind of |
| 02:31:35 | 18 | disability in dealing with the confrontation that would have |
| 02:31:38 | 19 | caused him to do something that could exacerbate the entire |
| 02:31:43 | 20 | situation, which may have called upon the officers to use |
| 02:31:46 | 21 | greater force than was used, it just -- I'm troubled over |
| 02:31:54 | 22 | what the officers could do here.  But, I do recognize the |
| 02:31:57 | 23 | plaintiff's argument that perhaps some ADA training would |
| 02:32:00 | 24 | have helped.  But, the either side of that coin is that a |
| 02:32:05 | 25 | postical state, I've had some exposure to those over my years |

02:32:10   1   of experience, and they deal with people who are in varying

02:32:13   2   levels of mental recovery.  It usually starts with confusion

02:32:19   3   and then, sometimes, there's no sense of what they're doing or

02:32:22   4   how they're doing it, and then slowly evolves to a situation

02:32:27   5   where they do have some awareness.  And ultimately, and

02:32:30   6   hopefully, resolves in a situation where they come back to

02:32:33   7   normal.

02:32:34   8          But, how are the officers to know what the level is

02:32:38   9   of the state at the time?

02:32:41   10          I mean hindsight might help, but it might not.  But

02:32:46   11   at the scene at the time, recognizing everything that's going

02:32:49   12   on here, it strikes me that people would have a hard time

02:33:02   13   describing what else the officers could do than what they did.

02:33:09   14          I'll give you a ruling, but I suspect that I'm

02:33:16   15   really going to have to see and hear the evidence rather than

02:33:19   16   just -- I appreciate counsel's representations concerning

02:33:24   17   what happened.  I recognize that both of you have been very

02:33:29   18   forthright with me.  But, the fact is I need evidence to

02:33:33   19   decide this case on the merits and I don't have that at this

02:33:40   20   stage in the proceedings.  And yet, I recognize that it's in

02:33:43   21   everybody's interest to attempt to reach some resolution of

02:33:48   22   this within a reasonable amount of time.

02:33:51   23          So, I will get back to you as quickly as I can.  And

02:33:56   24   I thank you for your arguments.

02:33:58   25          Court will be adjourned.

—40—

02:34:01   1

2                    (Court Adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2

3         I certify that the foregoing is a correct
          transcript from the record of proceedings
4         in the above-entitled matter.

5    \s\ Kathryn M. French                  January 11, 2018
     _____          _____
6
          KATHRYN M. FRENCH, RPR, CCR                DATE
7         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25