Luke Andrew Busby, Ltd.
Nevada State Bar No. 10319
316 California Ave. 82
Reno, NV 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| JAMES O'DOAN,<br><br>                    Plaintiff(s),<br><br>          vs.<br><br>RENO POLICE OFFICER JOSHUA SANFORD, RENO POLICE OFFICER CADE LEAVITT, and THE CITY OF RENO, a political subdivision of the State of Nevada; and JOHN DOES I through X, inclusive<br><br>                    Defendant(s).<br>_____/ | Case No.  3:17-cv-00293-LRH-VPC<br><br>**RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

COMES NOW, JAMES O'DOAN, ("O'Doan" or "Plaintiff"), by and through the

undersigned counsel, and files the following Opposition to the Defendant's March 27, 2018

Motion for Summary Judgment ("Motion") filed by RENO POLICE OFFICER JOSHUA

SANFORD ("Sanford"), RENO POLICE OFFICER CADE LEAVITT ("Leavitt"), and

THE CITY OF RENO ("City of Reno"), a political subdivision of the State of Nevada.

This Opposition is made and based upon all of the pleadings and records on file for

this proceeding together with every exhibit that is mentioned herein or attached hereto (each

of which is incorporated by this reference as though it were set forth hereat in haec verba), if any there be, as well as the points and authorities set forth directly hereinafter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Standard of Review

1.    Pursuant to Federal Rule of Civil Procedure 56, an order granting summary judgment should be issued only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Summary judgment should be granted only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

### II. Statement of Facts

2.    The Plaintiff does not dispute the following facts listed in the Motion: (a) The Plaintiff has epilepsy (Motion at 2:13); (b) After having an epileptic seizure, Plaintiff enters a post-ictal (post seizure) state of altered consciousness (Motion at 2:14); (c) When Plaintiff is having a seizure, or is in a postictal state, he has the potential to physically harm others (Motion at 2:16); (d) At approximately 7:00 p.m. on July 15, 2016, Plaintiff's girlfriend, April O'Fria, called 911 dispatch after Plaintiff reportedly had a seizure, and she reported Plaintiff tended to wander the neighborhood after a seizure (Motion at 2:21); (e) After being judo-thrown by Sanford, Plaintiff was then transported by ambulance to Renown Regional

Medical Center, where he was treated by staff including Dr. Daryl J. Di Rocco. (Motion at 4:20); (f) The Plaintiff does not remember (1) the July 15, 2016 seizure, (2) encountering the Reno Fire Department, or (3) encountering the Reno Police on that day (until at Renown). (Motion at 4:23); The Plaintiff was arrested for indecent exposure and resisting a public officer. (Motion at 5:22).

As to the remaining facts alleged by the Defendants,  a genuine issue of material fact exists to each as described below.

**a.) O'Doan had  Seizure on the Night in Question and was Postictal when Detained by Sanford and Leavitt**

3.      O'Doan has a long and well documented history of suffering from epilepsy. (*See generally* Exhibit 1)  Epilepsy is a neurological disorder marked by sudden recurrent episodes of sensory disturbance, loss of consciousness, or convulsions, associated with abnormal electrical activity in the brain, commonly described as seizures.  *Id.*

4.      At approximately 6:55 p.m. on June 15, 2016, Mr. O'Doan suffered a grand mal seizure while taking a shower at his home on Gentry Way in Reno, Nevada, which he shares with April O'Fria.  *Id.*  A grand mal seizure features a loss of consciousness and violent muscle contractions. *Id.* Shortly thereafter O'Fria called 911 and reported that Mr. O'Doan was having a bad seizure.  After suffering the seizure, O'Doan, confused and disoriented in a postictal state, walked out of his and O'Fria's home completely naked, walked down Gentry Way and then turned north on Kietzke Ln. (*See* Exhibit 2) The EMS advisory for the event in question  clearly  indicates  that  Ms.  O'Fria  was  concerned  that  police,  not  understanding

3

O'Doan's condition, would attack him as this had happened before when O'Doan suffered a seizure in 2012. (*See* Exhibit 2). A merged file of the audio from O'Fria's 911 call is attached hereto as Exhibit 3, on which O'Fria can be heard trying to impress upon the operator that O'Doan was suffering from a seizure and was not in his right mind. (*Id.)* The 911 operator communicated this to Sanford and Leavitt, who were heading to the scene. (*See* Exhibit 2)

5.      After suffering a seizure, Mr. O'Doan enters a "postictal" state, which is a post seizure state of altered consciousness under which Mr. O'Doan is completely confused and and is unaware of his actions. (*See* Exhibit 1)  As cited in the expert report of Dr. Gary Greenberg in Exhibit 1, according to a Case Report published in the medical journal Epilepsy & Behavior Case Reports Volume 1, 2013, Pages 71-73, *Acute postictal confusion and violence: Two Cases with unfortunate outcomes*, a postictal state may have the following characteristics:

> In temporal lobe epilepsy (TLE), the postictal state is typically characterized by confusion and disorientation. Perhaps as a result of these feelings, patients are also often fearful and agitated and may forcefully resist being restrained [1,2]. As opposed to such reactive violence, spontaneous postictal violence is rare, though well described [2–5].

6.      The report in Exhibit 1 by Dr. Greenberg contains a discussion of the medical literature regarding postictal phenomena.   Dr. Greenberg concluded the following in O'Doan's case:

> Based on the complete clinical picture, it is clear that Mr. O'Doan had experienced a grand mal seizure and was in postictal state when REMSA and Reno police arrived. Furthermore, he was substantively not in a rational mental state and his actions were not of his own volition when apprehended. Basically, he was not of a mental status to understand the nature and quality of his actions. Clearly he was in a mentally impaired state. (Ex 1 at 4 of Report)

7.    According to Dr. Greenberg, "in a post-ictal phase a patient may appear outwardly appropriate but still undergoing seizure activity." (Exhibit 1 at 3)  Further, the proper medical course of action for a patient presenting with a postictal state is to avoid the use of force or restraint unless absolutely necessary. (Exhibit 1 at 5)  The Defendants did not produce an expert witness to rebut Dr. Greenberg's findings.

**b.) Sanford and Leavitt Knew the 911 Call was an Emergency Medical Call for an Epileptic Having a Seizure**

8.    The Defendants' claim that, "Neither Sanford nor Leavitt ever heard the July 15, 2016 calls to dispatch until their depositions." (Motion at 5:1)  While both Sanford and Leavitt stated that they had never heard the 911 calls, upon reviewing the EMS advisory in Exhibit 2 at this deposition, Sanford admitted that he was advised by dispatch before he arrived at the scene that O'Doan was having a grand mal seizure and that last time officers attacked him due to his being in a seizure. (Exhibit 4 at  24:1)  Officer Leavitt, despite recognizing his call sign in the EMS advisory in Exhibit 2 (Exhibit 5 at 21:23), and that he was in the same squad car as Sanford, (*Id.* at 26:13), stated that he could not recall if he was called to the scene of the incident in this case because O'Doan was having a seizure. (*Id.* at 24:13).  Leavitt's denials that he knew that O'Doan was having a seizure when he arrived on scene are suspect given the other evidence in this case, i.e. the EMS Advisory which Leavitt acknowledged contains his own call sign and that Sanford admitted that he knew O'Doan was having a seizure.  Before encountering O'Doan Sanford and Leavitt were advised of the situation they were approaching and knew that O'Doan was suffering from a medical

condition and was not a suspect fleeing the scene of a crime.

9.     Several Reno Fire Department ("RFD") firefighters arrived on scene before Sanford and Leavitt, including Captain Haugland, Firefighter Blondfield, Firefighter Alt, and Firefighter Webber.  These firefighters were each deposed, and provided conflicting and at times self contradictory reports of what happened with O'Doan on the night in question. For example, Blondfield reported that after being detained by Sanford, that O'Doan was handcuffed while he was being put on the gurney (Exhibit 6 at 17:24) and that O'Doan would "try and take a swing at you" while on the gurney. (Exhibit 6 at  19:5-13) Blondfield also reported that the event involved a domestic disturbance (Exhibit 6 at 8:21), but acknowledged that the Reno Fire Department report from the incident attached hereto as Exhibit 7 does not indicate that there was a domestic disturbance. (Exhibit 6 at 11:3)  When asked if O'Doan took any aggressive action towards the police, Captain Haugland reported that O'Doan pulled away and kept walking. (Exhibit 8 at 17:4) When asked if O'Doan clenched his fist at the officers, Haugland stated that he did not recall (Exhibit 8 at 17:9). The Motion states that all of the firefighters have training and experience with persons suffering from seizures (Motion at 3:3), but Haugland stated that he has received no training regarding postictal states or epilepsy. (Exhibit 8 at 24:8)  Blondfield stated that he had training for postictal states but not epilepsy. (Exhibit at 6 21:8) Firefighter Alt testified that the call was for a domestic disturbance and not for an epileptic having a seizure. (Exhibit 9 at 9:15 and 12:14)   Alt also acknowledged that the word "domestic" does not appear in the report in Exhibit 7 (Exhibit 9 at 10:8), even though Alt acknowledged that the document in

Exhibit 7 accurately described his recollection of the events on the night in question. (Exhibit 9 at 8:15)  Alt was the third firefighter to be deposed on the day in question, and stated that counsel for the city provided him with the exhibits from the previous depositions to review. (Exhibit 9 at 10:13) Alt testified that O'Doan did not make any aggressive movements when walking towards the firefighters on scene. (Exhibit 9 at 15:4)  Alt also described that when Leavitt and Sanford were trying to detain O'Doan, that he was very agitated, "fighting not in the sense that I didn't see him throw any punches, but he was extremely agitated and obviously did not want to be taken into custody." (Exhibit 9 at 18:17)   Alt also denied that he knew O'Doan had epilepsy at the time of the incident (Exhibit 9 at 22:20) despite the fact that Alt stated that there were conversations about what was happening on the scene, and his fellow firefighter Blondfield testified that he was told O'Doan was epileptic and that Blondfield told REMSA that O'Doan was epileptic. (Exhibit 9 at 23:1 and Exhibit 6 at 17:4) Alt admitted that epileptics are not in control of their behavior while having a seizure or when postictal. (Exhibit 9 at 27:16)  Alt claimed to be an expert on epilepsy (Exhibit 9 at 31:6) and stated, "You can't walk that way in a postictal state" (Exhibit 9 at 31:4), yet, Alt admitted that he is not a doctor nor a neurologist (Exhibit 9 at 31:23).  Firefighter Webber, who was driving by the scene of the indecent when it occurred (Exhibit 10 at 9:2),  testified that he saw O'Doan get "tackled" (Exhibit 10 at 10:8) but  agreed that it didn't strike him as a violent thing to do (Exhibit 10 at 13:23). Attempting to frame this case a "domestic disturbance," rather than an emergency medical call, would change the nature of the analysis of this case under the objective reasonableness standard of the Fourth Amendment set forth

in *Graham v. Connor*, 490 U.S. 386, 397 (1989) - It is doubtful that Blondfield or Alt know this, but it does make a reasonable person question as to whether they were directed by someone to state that this is what happened.  The RFD incident report in Exhibit 7 clearly states that this was an emergency medical call, not a domestic disturbance, and refers to O'Doan as a "patient."

**c.) Sanford and Leavitt received no Training from the City as to what the ADA requires and/or what Epilepsy is**

10.     At Sanford's deposition, when asked if he had received any training about the ADA of epilepsy, or whether he understood that the ADA made unlawful to discriminate against those with disabilities,  Sanford refused to provide a straightforward answer, stating he could not recall any specific dates, times, literature, and that he did not remember (Exhibit 4 at 60:14 to 63:12).  At his deposition, Leavitt provided essentially the same types of vague responses and specifically stating that he did not know whether epilepsy is a disability under the ADA and that he could not recall any training regarding epilepsy (Exhibit 5 at 63:9 to 65:2).

**d.) The 911 Call was For Medical Help, the Amount of Force Used by Sanford Was Excessive**

11.     When Sanford and Leavitt arrived on scene, upon approaching O'Doan, Sanford's report from the incident states that he performed a "reverse reap" throw on O'Doan after O'Doan did not respond to Sanford's commands and attempted to run away. Sanford's report from the incident states that throwing O'Doan, "...caused ODOAN's head

to receive lacerations and swelling on it in a variety of places." (See Exhibit 11 at 9)   At Sanford's deposition, he testified that O'Doan did not receive lacerations on his head. (Exhibit 4 at 35:5)  Sanford also stated at his deposition that when he first saw O'Doan, he didn't have any visible injuries, which Sanford could discern because O'Doan was naked. (Exhibit 4 at 34:23) Sanford testified that O'Doan was placed in handcuffs behind his back. (Exhibit 4 at 38:14) Sanford also stated that he called his supervisor while on scene, Sergeant Browett, and explained what had occured and that, "I informed Browitt that they're claiming that he was suffering from a seizure." (Exhibit 4 at 43:12)  Leavitt's report from the incident states, "ODOAN was restrained with REMSA's gurney restraints so ODOAN could receive the medical attention he needed and not harm them." (Exhibit 11 at 7).

**d.) ER Doctor Diagnoses O'Doan with Having Had a Seizure**

12.     O'Doan was then transported by REMSA to Renown Regional Medical Center where he was treated by ER Dr. Daryl J. Di Rocco.  Dr. Di Rocco stated at his deposition that he did not recognize O'Doan and did not have any independent recollection of the events of this case. (Exhibit 12 at 7:15 and 8:3)  Thus, Dr. Di Rocco's testimony was based solely on his review of O'Doan's medical record from the Renown ER on the night of the incident, attached hereto as Exhibit 13, which Di Rocco identified and authenticated at his deposition. (Exhibit 12 at 8:7)  Dr. Di Rocco stated at his deposition that there were four diagnosis from the records: seizure, abrasions of multiple site, contusions of the foot, and tobacco use. (Exhibit 12 at 9:6)  Dr. Di Rocco acknowledged that a postictal epileptic can behave in ways that can be misinterpreted (Exhibit 12 at 12:18), stating:     "Well,

combativeness is something that occurs when people come out of their seizure in their postictal state.  So I suppose that could be misinterpreted." (Exhibit 12 at 12:23)

13.     The City claims in its Motion that Dr. DiRocco couldn't state whether O'Doan was in a postictal state when he was first contacted by the Reno Police (Motion at 5:14 and 8:Fn.3).  The reason for this is obvious by virtue of the question.  Dr. Di Rocco was not present when O'Doan was detained by Sanford and Leavitt so it would be impossible for him to know - Dr. Di Rocco explained as much at his deposition  (Exhibit 12 at 14:3)  Dr. Di Rocco confirmed that his diagnosis, to a reasonable degree of medical probability, was that O'Doan had suffered a seizure (Exhibit 12 at 14:8 and 54:10) and that Dr. Di Rocco knew that O'Doan had a history of epilepsy from his prior medical records (Exhibit 12 at 20:18 and 21:18).  The Motion argues that, "It is undisputed Plaintiff cannot prove a seizure or postictal state at trial to negate the grounds for arrest."  (Motion at 8 fn. 3) The Plaintiff's expert report in Exhibit 1 and the testimony of Dr. Di Rocco cited above both confirmed that O'Doan had a seizure on the night in question and the Defendants offer no expert opinion to counter these conclusions.

14.     Sanford claims not to have been present when O'Doan was being treated at Renown (Exhibit 4 at 47:25).  Leavitt interviewed O'Doan at Renown and in the Motion it is claimed that Leavitt was told by O'Doan that he had suffered a seizure and that Dr. Di Rocco allegedly stated that, "this does not match up to what Mr. O'Doan is saying," citing Leavitt's deposition, not Dr. Di Rocco's deposition. (Motion at 5:3)  Dr. Di Rocco stated that he did not recall discussing O'Doan's diagnosis with the police on the night in question

(Exhibit 12 at 11:24), that a person's medical condition would be discussed with the police if a person is in custody (Exhibit 12 at 12:4), and that Dr. Di Rocco stated that combativeness is something that occurs when people come out of their seizure in their postictal state. (Exhibit 12 at 12:23). Dr. DiRocco stated that he did not know that O'Doan's was going to jail after he was released from Renown. (Exhibit 12 at 52:7)  Leavitt's claim that Dr. Di Rocco told him in the ER that it doesn't make sense that O'Doan was combative after suffering a seizure is directly inconsistent with Dr. Di Rocco's testimony in Exhibit 12 and the Medical records from Renown from the night in question in Exhibit 13.

15.    Sanford was aware of O'Doan's diagnosis because O'Doan's discharge papers from Renown were provided to Sanford.  At his deposition, Sanford originally claimed that he was not provided with any paperwork from Renown after O'Doan was transported there (Exhibit 4 at 48:3).  When asked to examine the document in Exhibit 14, which are O'Doan's discharge papers from Renown, Sanford immediately identified that the diagnosis provided was "seizure."  (Exhibit 4 at 49:11)  When asked again if he was provided with any documentation when O'Doan was released from Renown, Sanford again stated that he believed he was not (Exhibit 4 at 49:18), but then identified his signature and badge number on page 7 of Exhibit 14. (Exhibit 4 50:5)  The exchange above shows that, (1) Sanford was undeniably provided with O'Doans discharge papers in the first place, and (2) Sanford signed a document from Renown which clearly showed that O'Doan was diagnosed with having a seizure on the night in question.  Sanford's claim of ignorance of O'Doan's diagnosis by Dr. Di Rocco is a fact in dispute.  This is especially the case because Leavitt stated that Sanford

ratified his decision to arrest O'Doan at Renown after O'Doan was treated by Dr. Di Rocco. (Exhibit 5 62:21)

16.     After O'Doan was taken to Renown, O'Fria went to Renown to see O'Doan and to provide him with his epilepsy medication, but she was not permitted to do so because the police were involved (Exhibit 15 at 122:4), meaning O'Fria believed that the police would not let her see O'Doan, which was unusual in her experience based on her visiting O'Doan in the hospital after he had suffered seizures on other occasions. *Id.* at 122.

**e. Instead of Going Home, Leavitt and Sanford Ignore Di Rocco's Diagnosis, and O'Doan is Arrested in a Hospital Gown and Taken to Jail**

17.     O'Doan was released by Renown at approximately 9:41 p.m. into the custody of Sanford and Leavitt. (See Exhibit 13) Instead of releasing O'Doan after Dr. Di Rocco's diagnosis, Leavitt charged O'Doan with indecent exposure and resisting a public officer. Leavitt stated that he was the one who made the decision to arrest O'Doan. (Exhibit 5 at 60:1)  Leavitt stated that he made the decision to arrest O'Doan at Renown in the ER (Exhibit 5 at 60:11), and that O'Doan was wearing a hospital gown when he was arrested. (Exhibit 5 at 61:6)  Leavitt stated that he probably discussed the decision to arrest O'Doan with Sanford before doing so (Exhibit 5 at 62:10) and that Sanford ratified his decision to arrest O'Doan. (Exhibit 5 62:21)

18.     O'Doan was then taken from Renown in a hospital gown, and was placed in a Reno Police paddy wagon along with other suspects. (See Exhibit 16 at 87:11 and 91:2) O'Doan was finally booked at the Washoe County jail and spent the night in custody until he

was released on bail at 9:30 am on June 16, 2016. *Id.* at 104.

19.     O'Fria testified that after she learned that O'Doan was arrested, that she called Reno Police Department and spoke with Sergeant Browett and complained that she had called for an ambulance because O'Doan was having a seizure and asked, "Do you not see how this is unfair?" (Exhibit 15 at 126:6)  O'Fria testified that Browett responded that it was not the Reno Police Department's job to asses the situation, but that she informed Browett that O'Doan had epilepsy, and that Browett was using the term postictal so he knew what it meant. *Id.* at 126-127

20.     The Arrest Report and Declaration of Probable Cause on page 11 of Exhibit 11, signed by Leavitt, indicates that Sanford also arrested O'Doan, and that Sergeant Browett was the reviewing supervisor.  O'Doan was charged with indecent exposure and resisting a public officer.  "Indecent exposure," codified in NRS 201.220 is a sex offence per NRS 179D.097.  In *State v. Castaneda*, 126 Nev. 478, 483, 245 P.3d 550, 554 (2010), opinion modified on denial of reh'g, No. 52911, 2010 WL 5559401 (Nev. Dec. 22, 2010) the Court interpreted NRS 201.220 to mean that a person intentionally and publicly displayed their genitals by incorporation on the intentionality requirement included in NRS 193.050(3).  If O'Doan had been convicted of this offence, he would have had to register as a sex offender per NRS 179D.095 and NRS 179D.441.

21.     O'Fria testified the day after the incident O'Doan looked like he had been beaten (Exhibit 15 at 128:11) and that he had never looked like this before after having had a seizure.  *Id.*  Photos of O'Doan after the incident corroborate O'Fria's impression that

O'Doan looked like he had been beaten. (See Exhibit 17)

**f). All Charges Against O'Doan Are Dismissed by The District Attorney**

22.     The Motion states that the Reno Justice Court found probable cause for O'Doan's arrest. (Motion at 5:24)   However, nowhere in any of the reports about the incident created by Sanford and Leavitt in Exhibit 11 is it mentioned that O'Doan was an epileptic or that O'Doan suffered a seizure on the evening in question despite clear evidence presented above that both Sanford and Leavitt knew that this is what happened to O'Doan. It is no mystery that the Reno Justice Court found probable cause when it was not apprised of the central fact in the case by Sanford and Leavitt.  As indicated in Exhibit 18, the charges against O'Doan were dismissed by the District Attorney, presumably after the DA was apprised of the true facts of the case, i.e. O'Doan was arrested because he suffered seizure.

**g.) Plaintiff's Expert Concludes that Sanford and Leavitt's Conduct was Not in Accordance with Police Training or Practices**

23.     The Plaintiff's retained police practices expert Roger Clark to review the facts in this case.   Mr. Clark's report and qualifications are attached hereto as Exhibit 19.   As described on pages 14 to 20 of Clark's report, Clark has extensive law enforcement experience, including  27 years with the Los Angeles County Sheriff's Department and extensive experience training officers and testifying in cases related to police misconduct. Mr. Clark's report on this case came to the following conclusions in pertinent part:

(1) Mr. O'Doan was physically and mentally unable to form any deliberate intent to disobey any possible lawful orders or otherwise wilfully resist ay law enforcement officers at the scene. Mr. O'Doan was a medical patient and not a criminal suspect. Mr. O'Doan should have never been subjected to any force as a criminal suspect;

(2) As POST Certified Law Enforcement Officers Sanford and Leavitt were trained and required to know that Mr. O'Doan was not a criminal suspect and should not be arrested and booked on criminal charges because he was not conscious of his acts;

(3) … no language, in any of the reports from Officers Leavitt or Sanford, mentioned that Mr. O'Doan was an epileptic or that Mr. O'Doan suffered a seizure on the evening in question despite clear evidence that both Officer Sanford and Officer Leavitt knew that this is what happened to Mr. O'Doan. In my opinion, there are indications in Officer Leavitt's deposition that the charges were alleged to justify the use of force inflicted upon Mr. O'Doan during his arrest;

(4) There is nothing in the record to indicate that Mr. O'Doan posed a credible threat to Officers Sanford and Leavitt. He had not been threatening, assaultive or combative to the officers, he had no weapon in his possession, and he had not uttered any threats to anyone present. His behavior at the scene simply did not justify the use of any physical force; and

(5) Officers are trained that the failure to provide the required ADA accommodation is a per se denial of the accommodation. In this incident, the RPD in general, and Officers Sanford and Leavitt in particular utterly failed to provide the required assistance and accommodations to Mr. O'Doan.  (See Exhibit 19 at 10-14)

The Defendants did not produce any expert witness to rebut Mr. Clark's findings.

24.     Training materials from the Epilepsy Foundation are readily available and these materials concisely describe what epilepsy is and how law enforcement can misinterpret the behavior of an epileptic as uncooperative or combative if uninformed or not trained about the nature of the disease. (*See* Exhibits 20 and 21):

> Many of the problems that crop up when law enforcement responds to a seizure are due to the officer's unfamiliarity with the real nature of these episodes. Police may interpret dazed behavior, inability to obey directives, and a combative response to restraint as conscious actions. Police are likely to react with force and may try to arrest the person having the seizure. Such response is humiliating to the person involved, and may cause injury or other negative consequences. (Exhibit 20 at O'DOAN 910)

Although materials regarding what training Sanford and Leavitt received were requested from

the Defendants during discovery in this matter, no applicable materials were disclosed, i.e. training materials that address the ADA's applicability to arrests and materials about epilepsy or seizures. .

25.     Nearly a year after the July 15, 2016 incident, Mr. O'Doan suffered another seizure on July 1, 2017, which was captured on video. (*See* Exhibit 22) Exhibit 22 shows medical responders and Washoe County Sheriff's Deputies properly handling O'Doan, who is clearly postictal.  Ms. O'Fria took the video and authenticated it at her deposition. (See Exhibit 15 at 123)

**III. The Defendants' Motion**

**a.) O'Doan's Arrest because of his Epilepsy was a Violation of the ADA**

26.     The Defendant's argue that the Actions Taken by Sanford and Leavitt were not by reason of O'Doans epilepsy. (Motion at 6:19)   The evidence presented above taken a whole shows that Sanford and Leavitt were purposefully and deliberately indifferent to the fact that O'Doan has epilepsy.

27.     O'Doan is a qualified individual with a recognized disability under the ADA pursuant to 42 U.S.C. Section 12132.  As O'Fria testified, O'Doan is regarded as having an impairment because of his epilepsy (Exhibit 15 at 130:15) and that this impairment substantially limits his major life activities. (Id. at 130:18)

28.     The City of Reno is a local government and is subject to the requirements of Title II the ADA under 42 U.S.C. Section 12131(1)(A) and is vicariously liable for the acts of Sanford and Leavitt that violate the ADA.  Title II of the ADA requires government agencies

to take disability into account by making reasonable modifications of their policies and practices where needed. 42 U.S.C. Section 12132, 28 C.F.R. Section 35.130(b)(7) (2014).

29. Epileptics have long faced wrongful discrimination and stigma based on misperceptions and ignorance about the disease.[1] Historically, the cause of epilepsy has been attributed to revenge of aggrieved ancestors, witchcraft, ghosts, and visitation by the devil.[2] Under the findings section of the ADA, it states:

> Individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; 42 U.S.C.A. § 12101(a)(5) (West)

And that the purpose of the ADA is to:

> to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities. 42 U.S.C.A. § 12101(b)(2) (West)

30. Title II of the ADA was specifically designed to protect qualified individuals such as O'Doan from such unlawful discrimination on the basis of disability in services, programs, and activities provided by State and local government entities, such as The City of Reno.

31. Title II of the ADA applies to arrests. *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part, cert. dismissed in part sub nom. *City & Cty. of*

---

[1] de Boer, HM (Dec 2010). "Epilepsy stigma: moving from a global problem to global solutions.". Seizure : the journal of the British Epilepsy Association. 19 (10): 630–6. doi:10.1016/j.seizure.2010.10.017. PMID 21075013
[2] Epilepsy: A Comprehensive Textbook (3-volume set)Oct 6, 2007 by Jerome Engel Jr and Timothy A. Pedley MD

*San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015). The *Sheehan* case involved a mentally ill resident at a group home in San Francisco, who after acting erratically and threatening to kill her social worker, was shot by police after she grabbed a knife and threatened to kill officers. *Id.* at 1767. After the District Court granted summary judgment on Sheehan's ADA claims, the 9th Circuit reversed, finding that the ADA covers public services, programs, or activities, and that the ADA's accommodation requirement should be read to to encompass anything a public entity does. *Id.* at 1172. The Supreme Court granted certiorari on the question, but because the City of San Francisco changed its argument and conceded that the ADA applied to arrests in its brief before the Supreme Court, the Supreme Court declined to exercise its discretion to decide the issue and dismissed that question *Id.* at 1773-1774. Thus, the 9th Circuit's underlying ruling on the issue cited above in *Sheehan* is dispositive here. That is, in the 9th Circuit, Title II of the ADA applies to arrests, and as such, it applies to the arrest of O'Doan by Sanford and Leavitt. The Department of Justice has taken a similar position in an amicus brief in the *Sheehan* matter and in other cases.[3]

      32. The Defendant's argue that to avoid the vagaries of 42 U.S.C. §12131, Plaintiff relies on *Sheehan v. City and County of San Francisco*, 734 F.3d 1211 (9th Cir. 2014) and that under the ADA regulations, "services," "programs," and "activities" are not defined. 42 U.S.C. §12131. (See Motion at 6:21). The *Sheehan* court expressly found that, "The ADA applies broadly to police 'services, programs, or activities.' 42 U.S.C. § 12132. We have

---

[3] United States as Amicus Curiae, *Sheehan v. City & Cnty. of San Francisco, Cal., et al.*, No. 13-1412 (S. Ct. Jan. 16, 2015) (stating that Title II applies to arrests); Statement of Interest of the United States of Am. *Williams v. City of New York*, No. 12-cv-6805 (S.D.N.Y. Feb. 25, 2015) (ECF No. 69); Statement of Interest of the United States *L.G. v. Kenton Cnty., et al.*, No. 15-cv-143 (E.D. Ky. Oct. 2, 2015) (ECF No. 32).

interpreted these terms to encompass 'anything a public entity does.'" citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir.2002) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir.2001)) *Id.* at 1231.

33.     The legislative history of the Title II shows that Congress intended that Title II apply to arrests.  The House of Representatives Report states that Title II's applicability would extend to everything states and local governments do (H.R. Rep. No. 485, 101st Cong., 2d Sess. Pt. 2, at 84 (1990)), and that arrests as an activity where discriminatory treatment based on disability can be avoided with proper training of police. *Id.* at 50. Further, Title II was designed to address discrimination, including the arrest of individuals with disabilities by reason of that disability: "For example, persons who have epilepsy are sometimes inappropriately arrested because police officers have not received proper training to recognize seizures and to respond to them." (136 Cong. Rec. E1913, 1916 (1990) (statement of Rep Hoyer))

34.     The *Sheehan* Court described two types of ADA claims, both of which are plead by O'Doan:  (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *Id.* at 1231 citing *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 174, 21 A.D. Cases 1174, 38 NDLR P 172, 2009 WL

331966 (4th Cir. 2009).  The Defendants argue that "exigent circumstances" justify O'Doans assault and arrest under *Duval v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) and that O'Doan's arrest was not by reason of his epilepsy (Motion at 39:15).  The evidence shows, including the uncontested expert reports of Dr. Greenberg and Roger Clark in Exhibits 1 and 19,  that the entire situation in this case is the result of O'Doan's having a seizure and being in a postical state.  The Defendant's offer no credible alternative theory to rebut the facts in this case, as Sanford and Leavitt's claims of ignorance are not believable given the overwhelming evidence that shows that O'Doan suffered a seizure.

35.   The Plaintiff's claim under the ADA is that the City of Reno failed to train, supervise, and/or discipline Sanford and Leavitt in recognizing symptoms of a disability under Title II of the ADA (Amended Complaint Doc #7 at 5 :24) and that Sanford and Leavitt wrongfully arrested O'Doan because they misperceived the effects of O'Doan's disability as criminal activity. *Id.* at 6:5  The evidence above shows that Officer Sanford, not being trained to recognize what epilepsy is or the signs of a postical state, used excessive force on a confused and disoriented post seizure epileptic, and then Sanford and Leavitt charged O'Doan, rather than taking O'Doan's disability into account by making reasonable modifications of their policies and practices where needed, i.e. by not arresting a disabled persons for being disabled.  Sanford and Leavitt and now the City of Reno, refused, and apparently refuse still (based on their arguments in the Motion) to take the fact that O'Doan was an epileptic who suffered a horrific seizure on the night of the incident in question into account, as Title II of the ADA requires.

**b.) Sanford and Leavitt violated O'Doan's well established Constitutional Rights**

36.   The Defendant's argue that Sanford and Leavitt are entitled to qualified immunity for the Plaintiff's Section 1983 claims (Motion at 9:11)   Government officials performing discretionary functions are entitled to qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).   A qualified immunity analysis starts with the threshold question of whether, based upon the facts taken in the light most favorable to the party asserting the injury, did the conduct violate a Constitutional right.   If, however, a Constitutional violation occurred, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established Constitutional right. *Jackson v. City of Bremerton*, 268 F.3d 646, 651   (9th Cir. Wash. 2001).   A clearly established right is one that is sufficiently clear that a reasonable official would have understood that the conduct in question violates that right.   *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).   Acts that violate the Constitution are not and cannot be discretionary.   *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 939 (D. Nev. 2012) (citing *Jarvis v. City of Mesquite Police Dept.*, No. 09-CV-00851, 2012 U.S. Dist. LEXIS 22800, 2012 WL 600804, at 5 (D. Nev. Feb. 23, 2012) (citing *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir.2000)). To prevail on a claim under 42 USC Section 1983, O'Doan must show: (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived him of a federal constitutional or statutory right.   *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989).

37.     Here, there is no genuine issue of material fact as to whether Sanford and Leavitt were acting under color of Nevada law as police officers for the City of Reno.  As described in the Motion,  Sanford and Leavitt responded to O'Fria's 911 call while on duty with the Reno Police Department.  Sanford and Leavitt were acting pursuant to the powers and authority granted to them as peace officers by Nevada law, by detaining, and then arresting O'Doan.  For his civil rights claims, O'Doan relies on well established substantive rights conferred by the Fourth and Fourteenth Amendments, as described below.

### 1. Sanford used excessive force in detaining O'Doan

38.     The Defendant's argue that Sanford's actions do not constitute excessive force (Motion at 10:4) The Defendants argue that Sanford's use of force was objectively reasonable (Motion at 10).  All claims of excessive force, whether deadly or not, should be analyzed under the objective reasonableness standard of the Fourth Amendment set forth in *Graham v. Connor*, 490 U.S. 386, 397 (1989).

39.     The Plaintiff and the Defendant agree that when the Plaintiff is having a seizure or is in a postictal state he has the potential to harm himself and others.  This is self evident as O'Doan is not fully conscious during these episodes.  There is no amount of punishment that the Court can dole out to O'Doan that will prevent him from having seizures or from entering a postictal state.  In *Graham v. Connor*, Dethorne Graham, a diabetic suffering from an insulin reaction, was subjected to excessive force by officers who did not believe that he was a diabetic and misinterpreted his actions as drunkenness. *Id.* at 389.  O'Doan's case is similar to Mr. Graham's case in that both O'Doan and Graham were suffering from medical

conditions at the time of the use of excessive force by the police. As in *Graham*, Sanford chose to disregard what he was told was happening and to treat O'Doan as if he were a fleeing felon. Sanford's report states: "I performed a reverse reap throw on ODOAN which was successful in taking him to the ground. This caused ODOAN's head to receive lacerations and swelling on it in a variety of places." (*See* Exhibit 11). As described by Sanford at his deposition, a reverse reap throw involves placing a foot in front of the foot of the person being taken down in order to trip them, and is called a "reverse" throw because the person is facing away from the person doing the tripping. (Exhibit 4 at 33:2) Pictures of O'Doan after the incident, which speak for themselves, are attached as Exhibit 17. A naked person in a confused postictal state failing to immediately obey the commands or respond to a police officer, does not justify a police officer using force sufficient kill that person, which is a possible result from being tripped from behind head first into pavement or concrete while in a confused and disoriented state. As described above, a postictal state is typically characterized by confusion and disorientation and patients are also often fearful and agitated and may forcefully resist being restrained. There is no indication in the reports of Sanford and Leavitt that they tried to deescalate the situation by speaking O'Doan or to use a lesser degree of physical force as described in the training materials and videos in Exhibits 20 and 21.

40.     Determining whether the force used by Sanford to arrest O'Doan was reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on O'Doan's Fourth Amendment interests against the countervailing

governmental interests at stake in arresting O'Doan.   The nature of the crime or other circumstances known to the officer at the time force as applied should be modified as appropriate when the officers are acting under their community caretaking function rather than to counter crime.   In such circumstances, the 9th Circuit held that the better analytical approach focuses the inquiry on the seriousness of the situation that gives rise to the community caretaking function. *Ames v. King Cnty.*, 846 F.3d 340, 349 (9th Cir. 2017).   As indicated in the 911 calls in Exhibit 3, Ms. O'Fria was clearly calling for help because O'Doan was suffering from a medical episode and desperately needed medical treatment.   There is no denying from the tone of the 911 calls in that Ms. O'Frea was desperate for help, but it is also clear that she was terrified that officers would misinterpret O'Doan's behavior and attack him.   The police were called to the scene as part of their community caretaking function, because O'Doan has a disease and needed help, not as a result of a reported crime.

41.    The Ninth Circuit has repeatedly recognized that excessive force cases are rarely suited for even summary judgment because an the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); see also *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.")

42.    O'Doan's right to be free from excessive force was well established at the time of his arrest. *Tennessee v. Garner*, 471 U.S. 1, 712 (1985).   No reasonable officer could believe that using such force on a confused and disoriented postictal epileptic is consistent with the

4th Amendment prohibition on the use of excessive force.

### 2. O'Doan was unlawfully arrested in violation of the 4th Amendment

43.   The Defendant's argue that O'Doan's unlawful seizure claim has no evidentiary support (Motion at 11:17)   Under the totality of the facts and circumstances known to Sanford and Leavitt, a prudent person would not have concluded that there was a fair probability that O'Doan had committed a crime. *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir.2010) and *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir.1984).   An arresting officer's state of mind, except for the facts that the officer knows, is irrelevant to the existence of probable cause.   *Devenpeck v. Alford*, 543 U.S. 146, 15253 (2004).   As alleged in the Amended Complaint, the central and critical fact that Sanford and Leavitt knew in this case, from the time that they were called to the scene to the time that they arrested O'Doan, was that O'Doan was an epileptic and that he had suffered a seizure.   The fact that Sanford and Leavitt chose to omit this fact in their arrest and probable cause reports from the incident is left unexplained in the Motion.

44.   The Defendants argue that Reno Justice Court found probable cause for O'Doan's arrest existed. (Motion at page 4 line 16)   What the Defendants do not state is that this finding by the Reno Justice Court was based solely on a review of Leavitt's Probable Cause Declaration in Exhibit 11 at page 11, which makes no mention of the fact that O'Doan had suffered a seizure.   According to the Case Summary for O'Doan's underlying criminal charge attached hereto as Exhibit 23,  there was no preliminary hearing held and the Court's probable cause determination was made solely on review of Leavitt's declaration

before O'Doan was even arraigned. Exhibit 23 indicates that no plea was ever entered and the charges were, "Dismissed (before prelim.)" It is no mystery that the Reno Justice Court found probable cause when it was not apprised of the central fact in the case by Sanford and Leavitt - i.e. that O'Doan has epilepsy and had suffered a seizure. The Defendants have previously argued in this matter that issue preclusion bars O'Doan's claim because the Reno Justice Court found probable cause to arrest O'Doan. (See Doc. #33, Order denying Defendant's Motion to Dismiss Doc. #10, which invited briefing on this issue) The Defendants did not argue issue preclusion in the Motion. The Ninth Circuit has held that even where a state court finds probable cause to believe that plaintiff committed a crime at a preliminary hearing, a genuine dispute as to whether the law enforcement fabricated evidence still exists because the identity-of-issues requirement for issue preclusion is not met as the evidence available and known to law enforcement was different from the evidence presented to the court at the preliminary hearing. See *Wige v. City of Los Angeles*, 713 F.3d 1183, 1187 (9th Cir. 2013). O'Doan's case never got to a preliminary hearing where he could challenge the basis for his arrest.

45. At the time of O'Doan's arrest, his right to be free from unreasonable seizure was a well established Constitutional right. *Illinois v. Gates*, 462 U.S. 213 (1983). No reasonable officer could believe that arresting an epileptic for suffering a seizure is consistent with the 4th Amendment prohibition on wrongful arrest.

///

///

**c.) O'Doans Due Process Rights were violated by Sanford and Leavitt's Deliberate Indifference to and Reckless Disregard for Critical Facts in their Reports**

46.     The Defendant's argue that there was no violation of due process (Motion at 12:8)  Sanford and Leavitt knew that O'Doan had epilepsy before they arrived at the scene of the incident.  Despite this, Sanford and Leavitt charged O'Doan with crimes despite the clear exculpatory evidence that O'Doan had a seizure, never mentioning in their reports that they knew that O'Doan was epileptic or that he had suffered a seizure.  By omitting this central fact, Sanford and Leavitt were deliberately indifferent and showed reckless disregard for O'Doan's rights and for the truth.  *Gantt v. City of L.A.*, 717 F.3d 702, 708 (9th Cir.2013); *Tennison v. City and Cnty.* of S.F., 570 F.3d 1078, 1089 (9th Cir.2009).

47.     In *Hale v. Fish*, 899 F.2d 390, 400 & n. 3 (5th Cir.1990) a plaintiff proved constitutional violation by showing that affidavit supporting arrest warrant contained critical omissions that would have negated probable cause.  Similarly, Sanford and Leavitt chose to leave out of their reports the fact that the very reason they were called to Gentry Way on July 15, 2016 was because O'Doan has epilepsy and had suffered a seizure, a facts which negates probable cause for his arrest.  Sanford and Leavitt continued their investigation and arrest of O'Doan despite the fact that Sanford and Leavitt knew that the Plaintiff was innocent, and/or Sanford and Leavitt were deliberately indifferent to O'Doan's innocence, i.e. Sanford and Leavitt ignored O'Doan's diagnosis by Dr. Di Rocco and numerous reports that O'Doan was an epileptic that had suffered a seizure, and the results of the investigation were used to criminally charge O'Doan. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

48.     At the time of O'Doan's arrest, his right to Due Process not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government was a well established Constitutional right.  *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) citing *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942). No reasonable officer would believe that creating a report of an incident involving an epileptic having a seizure that does not mention the following facts: (1) the 911 call was for an epileptic having a seizure; (2) that Sanford reported to Browett at the scene of the incident that O'Doan claimed he had a seizure; (3) that Dr. Di Rocco diagnosed O'Doan with having had a seizure; and (4) that O'Doan's discharge papers, which Sanford signed, stated that O'Doan had a seizure, consistent with O'Doan's Due Process rights.

### d.) O'Doan's State Law Claims are valid

49.     The Defendant's argue that Sanford and Leavitt are entitled to summary judgment on the pendent state law claims (Motion at 13:4) Police officers are allowed to use an amount of force that reasonably appears necessary, and are liable for battery only to the extent that they use more force than is reasonably necessary. *Ramirez v. City of Reno,* 925 F. Supp. 681, 691 (D. Nev. 1996) (discussing Nevada law).  The analysis of O'Doan's battery claim largely overlaps the analysis of whether the amount of force Sanford used was reasonable under the Fourth Amendment, which is argued at length above.  See, e.g., *Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F. Supp. 3d 999, 1014 (D. Nev. 2014) ("[T]he standard for battery by a police officer under Nevada law is the same as under a 42 USC Section 1983 claim.").  The 9th Circuit has held that an Officer is not entitled to

immunity from state law claims where a reasonable juror could find that the officer's conduct constituted a deliberate and willful disregard for the law.  *Davis v. City of Las Vegas*, 478 F.3d 1048, 2007 U.S. App. LEXIS 4580 (9th Cir. Nev. 2007).

50.  In *State v. Castaneda* , 126 Nev. 478, 483, 245 P.3d 550, 554 (2010), opinion modified on denial of reh'g, No. 52911, 2010 WL 5559401 (Nev. Dec. 22, 2010) the Court interpreted NRS 201.220, the offence with which O'Doan was charged, to mean that a person intentionally and publicly displayed their genitals by incorporation on the intentionality requirement included in NRS 193.050(3).  Further, the allegation that O'Doan resisted arrest also contains an intentionality requirement.  Courts have long held that crimes that involve "willful" conduct, including offenses that involve resisting arrest, require a showing of mens rea.  According the analysis of the *United States v. Bibbins*, 637 F.3d 1087, 1091 (9th Cir. Nev. 2011) Court, this includes crimes under which "resisting" is an element.

51.  Sanford and Leavitt arrested O'Doan despite the fact that they knew that he was an epileptic and had just suffered a seizure.  In light of the evidence presented above, there was no legal cause of justification for O'Doan's arrest.  As such, O'Doan has a valid claim for False Arrest and False Imprisonment.

WHEREFORE, the Plaintiff respectfully requests that the Motion be denied.

Respectfully submitted this April 23, 2018.

By: _____
Luke Busby
Nevada State Bar No. 10319
316 California Ave. 82
Reno, NV 89509
775-453-0112
luke@lukeandrewbusbyltd.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2018, I electronically transmitted the foregoing

pleading to document to the Clerk's Office using the CM/ECF System for filing and

transmittal of a Notice of Electronic Filing to all counsel registered to receive Electronic

Filings and/or I mailed the foregoing pleading to the address below by US Mail postage

prepaid, and/or I hand delivered the foregoing to:

Reno City Attorney
Attn: Mark Hughs
1 East First St.
Reno, Nevada 89501
*Attorney for the Defendants*

By: _____
Luke Busby

Exhibit List

1. Dr. Greenberg Expert Disclosure - 47
2. EMS Advisory - 1
3. a. 911 Call 2016-07-15_at_18.47.45 - b. 911 Call 2016-07-15_at_18.50.22 - c. 911 Call 2016-07-15_at_18.53.45 - d. 911 Call 2016-07-15_at_18.56.06
4. Sanford Deposition - 71
5. Leavitt Deposition - 82
6. Blondfield Deposition - 31
7. RFD Report - 3
8. Haugland Deposition - 30
9. Alt Deposition - 36
10. Webber Deposition - 19
11. RPD Case File - 14
12. DiRocco Deposition (Pertinent Portions) - 16
13. O'Doan Medical Records from Renown (CONFIDENTIAL)- 31
14. O'Doan Discharge Papers from Renown (CONFIDENTIAL) - 9
15. O'Fria Deposition (Pertinent Portions) - 12
16. O'Doan Deposition (Pertinent Portions) - 10
17. Photos of O'Doan after incident - 5
18. Dismissal Memorandum - 2
19. Roger Clark Expert Witness Disclosure - 57
20. Epilepsy Foundation Training Guide - 14
21. Epilepsy Foundation Training Video - 1
22. July 1, 2017 Seizure Video  - 1
23. Justice Court Case Summary - 3