UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JAMES O'DOAN,<br><br>Plaintiff,<br><br>v.<br><br>RENO POLICE OFFICER JOSHUA SANFORD, RENO POLICE OFFICER CADE LEAVITT, and THE CITY OF RENO, a political subdivision of the State of Nevada; and JOHN DOES I through X, inclusive,<br><br>Defendants. | Case No. 3:17-cv-00293-LRH-CBC<br><br>ORDER |

The City of Reno ("City"), Joshua Sanford ("Sanford"), and Cade Leavitt ("Leavitt") (collectively "defendants") move this court for summary judgment. ECF No. 39. Plaintiff, James O'Doan ("O'Doan") filed a response, to which defendants replied. ECF Nos. 42, 48. The court now grants defendants' motion.

I.     BACKGROUND

On June 15, 2016, at approximately 7:00 p.m., O'Doan alleges he suffered a *grand mal* seizure while taking a shower. ECF No. 7 ¶ 10. O'Doan, who is epileptic, alleges that after he suffers from a seizure, he enters a "post-ictal" state, during which he is unable to cooperate because he is not conscious. *Id.* ¶¶ 9, 14. On the date at issue, following the seizure, O'Doan left his home on Gentry Way in Reno, Nevada, and began wandering, fully nude, in this alleged altered state. *Id.* ¶¶ 10-11, 15. O'Doan's girlfriend, April O'Frea ("O'Frea"), called 911 to report

1

O'Doan's seizure and request help. *Id.* ¶¶ 11-12. O'Frea indicated that O'Doan had been attacked by police in the past during seizures because he doesn't listen and repeatedly informed dispatch of O'Doan's medical condition. *Id.* ¶¶ 13, 16.

Firefighters trained for medical emergencies and REMSA were dispatched by the 911 operator and arrived at the scene. ECF No. 39-4 at 4-6; ECF No. 42-2. After being unsuccessful in restraining O'Doan, they began to pursue him on foot as he walked northbound along Kietzke Lane in his naked state. ECF No. 42-4 at 28; ECF 42-2. On request of the firefighters and REMSA, police assistance was expedited, and Reno Police Officers Sanford and Leavitt were dispatched to the scene. *Id.* at 23; ECF No. 39-4 at 6. When the officers arrived, they directed O'Doan to stop and announced themselves as police. ECF No. 42-4 at 30. O'Doan ignored their instructions, and "ball[ed] up both his fists and kind of [brought] his arms, his forearms, up, not at a full 90-degree angle, but he [brought] them up slightly." *Id.* at 31. Leavitt then attempted to use his TASER on O'Doan, however, it malfunctioned. *Id.* at 32. Sanford then performed a "reverse reap throw," taking O'Doan down to the ground. *Id.* at 33. Sanford's written report of the incident provides that "this caused O'Doan's head to receive lacerations and swelling on it in a variety of places." ECF No. 42-11 at 10. Sanford and Leavitt handcuffed O'Doan and placed him in Ripp leg restraints because he was actively attempting to kick officers and REMSA personnel. ECF No. 42-4 at 39. REMSA personnel were then able to sedate O'Doan and he was transported to Renown Regional Medical Center ("Renown"). ECF No. 7 ¶¶ 19-20. On the scene, Sanford advised his supervisor, Sergeant Browitt, that "they are claiming that he was suffering from a seizure." ECF No. 42-4 at 45. O'Doan admits that he has no memory of this incident. ECF No. 42 at 3.

Dr. Daryl Di Rocco ("Di Rocco") treated O'Doan in the emergency room at Renown and diagnosed him with having suffered from a seizure. *Id.* ¶ 20; ECF No. 42-12 at 8. O'Doan alleges that Di Rocco spoke with Sanford and Leavitt, and both were informed of the diagnosis. ECF No. 7 ¶ 22. Discharge papers indicate Sanford and O'Doan signed for the documents, however, Sanford does not remember doing so. ECF No. 42-4 at 51-52. Sanford also declared that "[n]either the emergency room doctor, nor anyone else at Renown, informed us that Plaintiff

2

supposedly had a seizure or was an epileptic." ECF No. 39-7 at 4. At approximately 9:41 p.m., O'Doan was discharged from Renown into the custody of Sanford and Leavitt. ECF No. 7 ¶ 23. Sanford and Leavitt then arrested O'Doan for indecent exposure and resisting a police officer, and he was transported to the Washoe County Jail and booked at 11:03 p.m.. *Id.* ¶¶ 24, 26, 28. The following morning, at approximately 9:30 a.m., O'Doan was released on bail. *Id.* ¶ 26.

Sanford and Leavitt both wrote police reports following the incident; though neither mention that O'Doan is epileptic, or that he alleges he had a seizure and was in a post-ictal state at the time of the incident. ECF No. 42-11 at 8-10. The charges were later dismissed without prejudice. *See* ECF Nos. 42-19; 42-21.

On May 8, 2018, O'Doan filed suit in this court alleging the following causes of action: (1) Violation of the ADA, 42 U.S.C. § 12132, against the City of Reno; (2) Excessive Force in violation of the 4th and 14th Amendments, under 42 U.S.C. § 1983, against Sanford; (3) Unlawful Seizure in violation of the 4th Amendment, under 42 U.S.C. § 1983, against Sanford and Leavitt; (4) Violation of 14th Amendment guaranteed Due Process, under 42 U.S.C. § 1983, against Sanford and Leavitt; (5) Assault and Battery against Sanford; and (6) False Arrest and False Imprisonment against Sanford and Leavitt. ECF Nos. 1, 7. The court's order on the pending dispositive motion now follows.

## II. LEGAL STANDARD

**Motion for Summary Judgment Pursuant to Civil Procedure Rule 56.**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

3

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

### III. DISCUSSION

**A. O'Doan has failed to establish an issue of fact exists as to whether the City of Reno violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.**

First, O'Doan alleges that the City of Reno failed to train, supervise, and/or discipline Sanford and Leavitt in recognizing symptoms of a disability under Title II of the ADA. ECF No. 7 ¶ 34. While this Circuit has no set standard for failure-to-train claims under the ADA, other courts have analyzed these claims under the § 1983 framework. *See Green v. Tri-County Metro. Transp. Dist. of Oregon*, 909 F. Supp. 2d 1211, 1220 (D. Or. 2012). Under § 1983, the City of Reno is liable "only if its policy or custom caused the constitutional deprivation complained of." *Mateyko v. Felix*, 924 F.2d 824, 826 (9th Cir. 1990) (citing *Monell v. Dep't of Social Servs.*, 436

4

U.S. 658, 690 (1978)). "The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

O'Doan has failed to provide any evidence that the City of Reno failed to train its officers on the rights of persons officers come into contract. Sanford testified that he received post-academy written and filed training on the ADA, though he was unable to pinpoint exact training literature or information he had received. *See* ECF Nos. 42-4 at 61. Leavitt testified that he had received general training on the ADA, but that he did not recall any specific training on epilepsy. ECF No. 42-5 at 66-67. Firefighter Blondfield testified that he believed training regarding epilepsy was covered under general medical training, but that he could not recall epilepsy specific training, and that he received training in posti-ictal states as part of his EMT advanced training. ECF No. 42-6 at 23. Firefighter Haughland testified that he was familiar with both epilepsy and post-ictal states, but states that he did not receive specific training regarding epilepsy or posit-ictal states. ECF No. 42-8 at 23, 26. Firefighter Alt testified that as an EMT advanced he had training in epilepsy and testified that he had on the job training in responding to epilepsy and post-ictal states. ECF No. 42-9 at 27-34. While this evidence may prove that the officers do not remember their training, or did not receive epilepsy specific training, it does not establish "a program-wide inadequacy in training" on persons covered under the ADA. *See Alexander v. City of and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994) ("In those cases where we have held that a question of fact existed as to the deliberately indifferent character of a municipality's failure to train, plaintiffs have alleged a program-wide inadequacy in training.").

However, even if the officers were inadequately trained to respond to epilepsy, to succeed on such a claim, O'Doan must also prove that the inadequate or deficient training "actually caused the officers' indifference to [his] medical needs." *See City of Canton*, 489 U.S. at 390-91. Here, this incident involves what appeared to be a noncompliant, fully nude individual, walking down a busy street. The officers needed to bring O'Doan under control in order to render both O'Doan and the scene safe. Further, O'Doan was in need of medical

5

attention, yet REMSA personnel and firefighter EMTs were unable to help him due to his noncompliant, agitated state. Therefore, even if the officers had known he was epileptic and in a post-ictal state, and been trained in how to handle people in such states, there is no evidence that the officers would have acted differently—they would still have needed to bring him under control, using the a reasonable amount of physical force, in order for him to be contained and treated.

Second, O'Doan's complaint also alleges that his rights were violated under the ADA because Sanford and Leavitt wrongly arrested him after they misperceived the effects of O'Doan's disability as criminal activity. ECF No. 7 ¶ 36. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a claim under Title II, O'Doan must show "that (1) he is a qualified individual with a disability, (2) he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of his disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Because plaintiff seeks to recover monetary damages, O'Doan must also prove intentional discrimination. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

Defendants do not dispute that O'Doan has epilepsy, which makes him a qualified individual with a disability under the Act. Second, the Ninth Circuit has held that Title II applies to arrests. *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th 2014), *rev'd in part, City and County of San Francisco, Cal. V. Sheehan*, 135 S. Ct. 1765, 1773-74 (2015) (declining to address this issue); *see also Williams v. City of New York*, 121 F. Supp. 3d 354, 365-66 n.14 (S.D. N.Y. 2015) (The Fourth, Fifth, Ninth, Tenth, and Eleventh Circuit Courts have generally found that "interactions between law enforcement and disabled individuals—whether initiated by the disabled individual or the police and whether the interaction culminates in an arrest—are 'services, programs, or activities' subject to the requirement of accommodation under

Title II of the ADA.") Therefore, the court agrees that the main issue under this analysis is whether the officers arrested O'Doan because of, or by reason of, his disability.

While O'Doan argues that the officers were aware he had a seizure, that is not clear from the record and there is no evidence to show the officers or medical personnel either knew or believed he was in a post-ictal state. Sanford testified that he had not heard the 9:1 calls placed by O'Frea until the deposition, and in his declaration, he states, "[n]either the emergency room doctor, nor anyone else at Renown, informed us that Plaintiff supposedly had a seizure or was an epileptic." *See* ECF No. 42-4 at 12-13, 17, 22; ECF No. 39-7 at 4. Leavitt testified that he did not recall any mention of epilepsy on the call. ECF No. 42-5 at 25. Leavitt also testified that after O'Doan was transported to Renown and had been treated by the physician, he spoke with O'Doan and was made aware that O'Doan alleged he had a seizure. *Id.* at 53. Leavitt further testified that he spoke with the treating physician, Di Rocco, who indicated that O'Doan's story did not match up. *Id.* at 54. Di Rocco testified that he had no memory of the incident, though based on his notes from the event, he had diagnosed O'Doan as suffering from a seizure. ECF No. 42-12 at 7-9; ECF No. 45-1.

From this record there is no evidence that the officers arrested O'Doan because he was epileptic. A Sixth Circuit decision with similar facts is instructive. S*ee Everson v. Leis*, 412 Fed. Appx. 771 (6th Cir. Feb. 10, 2011) (unpublished). There a plaintiff who "threatened to swing at mall security," attempted to kick and swing at approaching individuals, "kicked a deputy," and "continued to kick and fight" even after deputies placed him on the ground, was charged with assault and disorderly conduct. *Id.* at 773. Officers were aware of the man's condition as they were called to the scene because the man was reportedly suffering from a seizure. *Id.* at 772-773. In deciding a motion for summary judgment on the plaintiff's ADA claim, the lower court assumed the plaintiff's actions were involuntary due to his epilepsy, yet still found his ADA claim not actionable because any discrimination was unintentional. *Id.* at 774. Though it was also determined that the officer had not received any "training on accommodating people with epilepsy," the Sixth Circuit affirmed. *Id.* at 776.

7

First, when Sanford and Leavitt arrived at the scene, regardless of why they were called, it was their job to secure the scene and protect themselves and others. Therefore, when Sanford chose to take O'Doan down to the ground and restrain him, this was done to effectuate his job, not to discriminate against an individual suffering from a seizure or epilepsy. See *Id.* at 776-77 (finding that the officer did not intentionally discriminate against the plaintiff when he approached and restrained him).

Second, Sanford and Leavitt arrested O'Doan because he was wandering the streets fully nude, was noncompliant, and failed to respond to their orders, not because he suffered from a seizure or was epileptic. While the record indicates that the officers may have known O'Doan had had a seizure, nothing in the record indicates that the officers knew the seizure was ongoing or that he was in a post-ictal state when the charged conduct occurred. *See id.* at 778 (rejecting the plaintiff's argument that because the officer knew he had suffered from a seizure earlier, the officer knew he lacked the required *mens rea* to have committed the charged crime). Like in *Everson*, because the record does not show that the officers knew O'Doan's conduct was caused by his alleged post-ictal state, O'Doan has failed to establish that the officers arrest of him for that conduct—walking in public nude and resisting arrest—was intentional discrimination against him because of his disability. Accordingly, the court grants defendants' motion for summary judgment as to O'Doan's first cause of action.

**B. Qualified Immunity pursuant to 42 U.S.C. § 1983**

O'Doan alleges three causes of action pursuant to 42 U.S.C. § 1983: (1) Sanford used excessive force against him in violation of his 4th and 14th Amendment rights; (2) the officers unlawfully seized and arrested him in violation of his 4th Amendment rights; and (3) the officers violated his due process rights under the 14th Amendment. While there is no dispute that Officers Sanford and Leavitt were acting under color of state law when the incident occurred, defendants argue that the officers' conduct did not deprive O'Doan of either constitutional or statutory rights, and therefore, they are entitled to qualified immunity. The court will now address each of plaintiff's constitutional claims in turn.

### i. Officer Sanford is entitled to qualified immunity for O'Doan's second cause of action: excessive force in violation of his Fourth and Fourteenth Amendment rights.

"A private right of action exists against police officers who, acting under color of state law, violate federal constitutional or statutory rights." *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001) (citing 42 U.S.C. § 1983). However, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*) (internal quotation marks omitted). As the court has discretion of which prong of the qualified immunity test to address first, it therefore starts with whether plaintiff's right at issue was clearly established at the time of defendants' misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

The right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," such that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotations and citations omitted); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) ("a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in the defendant's shoes would have understood that he was violating it." (emphasis added)); *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) ("For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."); *Injeyan v. City of Laguna Beach*, 645 Fed. Appx. 577, (9th Cir. March 23, 2017) ("Qualified immunity applies unless existing case law makes clear to any reasonable officer in the defendant's particular position that his use of force is excessive."). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (internal quotations omitted).

O'Doan argues that his right to be free from excessive force pursuant to the Fourth and Fourteenth Amendments was violated when the officer Sanford used a "reverse reap throw" on

him while he was allegedly in a "post-ictal" state following a *grand mal* seizure. It is well established that generally, use of excessive force is a violation of the Fourth Amendment. *See Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). However, the Supreme Court has made clear that "established law" should not be defined generally; rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (internal quotation and citations omitted) (emphasis in original). Further, while "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the *specific* facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 308-309) (emphasis added).

The court has found no precedent before the Supreme Court, the Ninth Circuit, or this District that clearly establishes that using a nonlethal, reverse reap throw (or similar technique) to detain an individual, suffering from an alleged medical condition, who is nonresponsive and fails to comply with orders, is excessive force. Rather, the case law most closely on point provides for the opposite conclusion; that an officer in Sanford's position would be entitled to qualified immunity. *See Shafer*, 868 F.3d at 1117 (holding that it was not clearly established that an officer would violate a person's Fourth Amendment rights when the officer "progressively increases his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders and resists, obstructs, or delays the officer in his lawful performance of duties such that the officer has probable cause to arrest him in a challenging environment."); *Luchtel v. Hagemann*, 623 F.3d 975, 980-82 (9th Cir. 2010) (based on a totality of the circumstances, it was not excessive force for the officers to "use the least intrusive means available to them," and take to the ground a woman who was "running around the neighborhood out of control on drugs," acting delusional, and threatening suicide); *Bennett v. Gow*, 345 Fed. Appx. 286 (9th Cir. Sept. 10, 2009) (unpublished) (After Bennett attempted to twist away while Officer Gow was handcuffing him, "Officer Gow then pushed Bennett to the ground using relatively minor force and finished handcuffing him. Although certainly uncomfortable and unpleasant, the take-down was not an

objectively unreasonable use of force."); *Pope v. Las Vegas Metro. Police Dep't*, Case No. 2:12-cv-01867-LDG (PAL), 2014 WL 1092263, at *4, 8 (D. Nev. March 18, 2014) (after plaintiff was suspected of driving while intoxicated, used his car for balance while walking, and then attempted to pull away, the officer "took him to the ground with a controlled take down." Even though plaintiff's back was broken, the officer was entitled to qualified immunity, reasoning that "protection of qualified immunity does not require an officer to first obtain a medical history from an individual who is otherwise not obeying an officer's instructions before applying the force the officer believes is necessary to handcuff a resisting individual."), *aff'd* 647 Fed. Appx. 817, 820 (9th Cir. April 11, 2016) (unpublished) (based on the circumstances, the officer's "decision to take Pope to the ground in a 'controlled' manner was not excessive."); *see also Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016) ("our precedent does not clearly establish that this "takedown" maneuver—against a drunken, erratic suspect who is resisting arrest—is constitutionally unreasonable.").

Not only does this precedent make clear that Sanford's actions were not against clearly established Fourth Amendment rights, it also makes clear that Sanford's actions were not excessive force. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citations omitted). The analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Further, whether an officer acted reasonably "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Sanford testified that he was dispatched to the incident because "fire and REMSA needed Code 3 response to their scene;" Code 3 meaning, "there's something violent happening." ECF No. 42-4 at 23. While Sanford testified that before he arrived at the scene, he saw the dispatch

11

comment that read "RP advised the subject is in a grand mal seizure. Advised last time officers attacked him due to him being in a seizure," he did not hear any of the 911 calls prior to his deposition. *Id.* at 12-13, 17, 22, 26. Upon arriving at the scene, Sanford attempted to make contact with O'Doan, gave him verbal orders, told O'Doan to stop and identified himself as police. *Id.* at 30. O'Doan failed to comply with these orders and continued walking northbound on Kietzke Lane. *Id.* O'Doan then turned toward Sanford, "ball[ed] up his fists and kind of [brought] his arms, his forearms, up, not at a full 90-degree angle, but he [brought] them up slightly." *Id.* at 31. After Leavitt's TASER malfunctioned, Sanford performed a "reverse reap throw," which enabled Sanford to bring O'Doan to the ground. *Id.* at 33. O'Doan was placed in handcuffs and Ripp leg restraints because "he was actively trying to kick officers and medical personnel on the scene," while they attempted to bring him into their control. *Id.* at 39.

Based on a totality of the circumstances, Sanford used an objectively reasonable amount of force to bring O'Doan into his control. First, Sanford was dispatched for a Code 3, meaning when he arrived on the scene, he believed something violent was happening. Second, O'Doan failed to respond to his commands and made what appeared to be fighting gesture toward the officers. While plaintiff argues this was because he was in a "post-ictal" state, importantly, he admits that had he been left to wander the streets he could have been hurt or he could have hurt others. *See* ECF No. 39-2 at 6-7; *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2010) ("whether the suspect poses an immediate threat to the safety of the officers or others," is the "most important single element"). Third, O'Doan attempted to walk away from officers, even after they'd given him commands, and was unresponsive. Finally, O'Doan was proceeding down a public street fully nude. These circumstances show it was objectively reasonable for Sanford to bring O'Doan under his control and that he used a relatively minor amount of force reasonably necessary to do so.

Therefore, plaintiff has failed to prove either prong necessary to overcome defendants qualified immunity. Accordingly, the court grants defendants' motion for summary judgment as to O'Doan's second cause of action.

ii. <u>Officers Sanford and Leavitt are entitled to qualified immunity for O'Doan's third cause of action: unlawful seizure in violation of his Fourth Amendment rights.</u>

O'Doan also alleges that his Fourth Amendment rights were violated when he was arrested following his discharge from the hospital. Defendants maintain that it was lawful because they had probable cause to arrest O'Doan following the incident.

"Probable cause to arrest or detain is an absolute defense to any claim under § 1983 against police officers for wrongful arrest or false imprisonment, as the lack of probable cause is a necessary element of each." *Lacy v. County of Maricopa*, 631 F.Supp.2d 1183, 1193 (9th Cir. 2008). Further, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Similar to a court's determination of qualified immunity in cases of excessive force, "the court should ask whether agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed" after the incident. *Hunter*, 502 U.S. at 228.

"Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" a crime had been committed. *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause 'demands' factual 'specificity' and 'must be judged according to an objective standard,'" *U.S. v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (quoting *Terry v. State of Ohio*, 392 U.S. 1, 21-22 n.18 (1968)); the officer's "subjective beliefs are immaterial to our inquiry," *U.S. v. Struckman*, 603 F.3d 731, 740 (9th Cir. 2010).

Defendants argue that they had probable cause to arrest O'Doan because the facts and circumstances within their knowledge were sufficient for them to believe O'Doan was committing the offense charged: they observed O'Doan walking down the street completely nude, exposing his genitals; he took a threatening position toward officers when they attempted to make contact with him, balling and raising his fists; he failed to comply with officers' direct orders; he attempted to walk away from officers when ordered to stop; he resisted officer's

attempts to take him into custody, thrashing and kicking as officers handcuffed him and put his legs in Ripp restraints. While there is some discrepancy as to whether the officers were aware O'Doan had suffered a seizure, as discussed above, there is nothing in the record that indicates they were aware he was in a post-ictal state. And even if the officers were aware that O'Doan had suffered from a seizure earlier, from this record, it is clear that Sanford and Leavitte had probable cause to arrest O'Doan for indecent exposure and resisting arrest. Accordingly, the court grants defendants' motion for summary judgment as to O'Doan's third cause of action.

       iii.   <u>Officers Sanford and Leavitt are entitled to qualified immunity for O'Doan's fourth cause of action: violation of his right to Due Process under the Fourteenth Amendment.</u>

O'Doan claims that his right to Due Process under the Fourteenth Amendment was violated when Sanford and Leavitt failed to mention in their police report and supporting affidavit that he was alleged to have suffered from a seizure and was in a post-ictal state at the time of the incident. O'Doan also alleges his due process rights were violated when the officers continued their investigation and subsequently arrested him, even after knowing he had suffered from a seizure—a fact O'Doan argues is clear exculpatory evidence of the crimes charged. Defendants argue that they were not informed that he was epileptic and that when they arrived at the scene, they did not witness him having a seizure. Therefore, when Leavitt was informed that O'Doan alleged he had suffered a seizure, he followed up with Di Rocco, who indicated to Leavitt that O'Doan's story did not "match up." From these circumstances, defendants argue they did not violate his due process rights by continuing their investigation, ultimately arresting him, and failing to mention that he alleged he had a seizure during the incident.

The court again uses the two-step qualified immunity inquiry, determining whether defendants' conduct violated a clearly established constitutional or statutory right. *See White*, 137 S. Ct. at 551. As discussed above, qualified immunity should be granted unless the existing precedent clearly establishes that the officers' conduct violated a constitutional right. *Ashcroft*, 563 U.S. at 741. Additionally, to meet this exacting standard of "clearly established," the existing precedent must fit the facts at issue to a high degree of specificity. *Mullenix*, 135 S. Ct. at 308. While "there is a clearly established constitutional due process right not to be subjected to

14

criminal charges on the basis of false evidence that was deliberately fabricated by the government," *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (*en banc*), plaintiff has pointed to no case law that squarely governs the specific facts at issue here. No case law clearly establishes that if an officer failed to include in his police report or supporting affidavit an arrestee's self-serving statement regarding his medical condition, which was not fully verified by the treating physician, that the officer was violating the arrestee's due process rights. Further, plaintiff cites no case law that clearly establishes that an officer violates an arrestee's due process rights by investigating and subsequently arresting the individual for crimes the officer saw committed, even if a possible medical condition could mitigate the charged crimes.

Therefore, defendants are entitled to qualified immunity; accordingly, the court grants defendants' motion for summary judgment as to O'Doan's fourth cause of action.

### C. O'Doan's State Law Claims

i. <u>Officer Sanford's use of force was reasonable; therefore, the court grants defendants' motion for summary judgment on O'Doan's fifth cause of action.</u>

If a police officer uses more force than is reasonably necessary in making a lawful arrest, he or she commits a battery upon the arrestee. *See Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) ("Police officers are privileged to use the amount of force which reasonably appears necessary, and are liable for battery to the extent they use more force than is reasonably necessary."); *Yada v. Simpson*, 913 P.2d 1261, 126 (Nev. 1996) (the jury was instructed that "a police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested."). "The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard: Liability attaches at the point at which the level of force used by a peace office exceeds that which is objectively reasonable under the circumstances." *Ramirez*, 925 F. Supp. at 691.

As discussed above, Officer Sanford's use of force, applying a "reverse reap throw," in order to control O'Doan was not excessive. Therefore, as his use of force was objectively reasonable under the circumstances, the court must also grant defendants' motion for summary judgment as to O'Doan's fifth cause of action for assault and battery.

  ii. <u>Sanford and Leavitt had probable cause to arrest O'Doan; therefore, the court grants defendants' motion for summary judgment on O'Doan's sixth and seventh causes of action.</u>

As discussed above, Sanford and Leavitt had probable cause to arrest O'Doan. "[A]n arrest made with probable cause is privileged and not actionable." *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1144 (Nev. 1983). O'Doan argues that the officers knew he had suffered a seizure, but arrested him anyway, and therefore are liable for false arrest and imprisonment. However, as discussed at length above, even if the officers knew he had suffered a seizure, the record does not show that the officers knew O'Doan was in the alleged post-ictal state, such that he was not aware of his conduct and could not have the required *mens rea* to complete the crimes as charged. Rather, the officers knew O'Doan was fully nude and walking around in public; that he was nonresponsive to their orders; and that he resisted arrest. Further, when the officers followed up with O'Doan's treating physician, Di Rocco, on O'Doan's alleged seizure, Di Rocco indicated to the officers that the story "didn't match-up." Because these facts show the officers had probable cause to arrest O'Doan, they cannot be held liable for false arrest or imprisonment. Accordingly, the court grants defendants' motion for summary judgment as to O'Doan's sixth and seventh causes of action.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (ECF No. 39) is **GRANTED**.

The Clerk is directed to enter judgment for defendants in accordance with this order and close this case.

IT IS SO ORDERED.

DATED this 26 day of March, 2019.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE